**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 21-cr-114 (TJK)** |
| **v.** | : | |
| | : | |
| **KEVIN STRONG,** | : | |
| | : | |
| **Defendant.** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Kevin Strong ("Strong") to 14 days of incarceration, 36 months probation, $500 in restitution and 60 hours of community service.

**I.     Introduction**

The defendant, Kevin Strong, an employee of the Federal Aviation Administration (FAA), participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than one million dollars of property damage.

Strong pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building. As explained herein, a sentence of 14 days of incarceration is appropriate in this case because: (1) Strong was an Electronics Technician with the Federal Aviation Administration who posted online before January 6th that his badge could get him past police barriers; (2) his statements on Parler before January 6, 2021 indicated he went to

1

Washington that day "to fight"; (3) he observed barricades and saw police on the grounds and inside the Capitol, wearing riot gear; (4) Strong went into the Senate Wing Doors about 7 or 8 minutes after the initial breach; (5) Strong went into the non-public hallway by the Speaker of the House's office suite; (6) he was in the packed Statuary Hall connector as the rioters breached the police line into the House side of the Capitol; (7) he observed rioters damaging property inside the building;   (8) he took photographs and videos inside the Capitol; and (9) Strong deleted a photograph he took outside the Speaker's office. The Court must also consider that Strong's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed in disrupting the certification vote. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (Statement of Judge Chutkan).

### Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 39 (Statement of Offense), at 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to Strong's conduct and behavior on January 6.

*Kevin Strong's Role in the January 6, 2021 Attack on the Capitol*

Kevin Strong flew from Chicago, IL on January 4, 2021 to Washington, D.C. He went to attend the rally of former President Trump on January 6, 2021 to protest what he believed was fraud involved in the 2020 presidential election. The picture below, taken from his iCloud account, appears to support his reason for being at the Stop the Steal rally that day:



Strong met with another individual while listening to the speeches.  The two walked with the crowd to the Capitol grounds after the speeches ended.   Strong took pictures outside the Capitol building, which captured the crowd, including people climbing on the scaffolding and police on the upper area.  The three photographs below, apparently taken by Strong, are from his iCloud and Parler accounts (Strong is in the red beanie and glasses in the foreground of the first photo):



In the photograph below uniformed officers can be seen on the restricted grounds (circled in red):





Strong also took this picture of the Upper West Terrace, outside the Senate Wing Doors in which he entered:



United States Capitol Police surveillance footage (CCTV) shows Strong (tall, red beanie, grey coat, glasses) entering the building through the Senate Wing Doors with the other individual

at approximately 2:20 p.m., eight (8) minutes after the first breach of those doors. Broken glass

from the windows can be seen in the bottom right corner:



Strong was one of the first rioters to enter the Rotunda after that first breach, as depicted on CCTV

walking through the Rotunda at approximately 2:23 p.m.:



Strong was also one of the first to go into Statuary Hall about 2:23 p.m. to 2:34 p.m., shown on

CCTV below:





Approximately 2:26 pm Strong made his way to the hallway outside the Speaker's suite, a non-public area, again as shown on CCTV:





Within minutes of Strong's presence in this hallway, staffers for the Speaker ran in the very same hallway to hide from rioters into a conference room, where they barricaded the doors. Screen shots from a New York Times documentary shows this below[1]. A relevant clip is attached as Exhibit A in which you can hear the whispers of the staffers and the fear in their voices as they hide.





---

[1] New York Times – Day of Rage: How Trump Supporters Took the U.S. Capitol,
https://www.nytimes.com/video/us/politics/100000007606996/capitol-riot-trump-supporters.html

Strong then returned to Statuary Hall, as shown on a television broadcast aired at approximately 2:28 p.m. He was shown later in the same clip walking toward the Statuary Hall connector leading to the House side of the Capitol:





The screenshot below from YouTube/Washington Post shows Strong going back into the Statuary Hall Connector at 2:28 p.m. as rioters in the front of a police line were trying to break through to the House side of the Capitol:



Strong was next captured on CCTV in the Statuary Hall Connector about 2:35 p.m. He was in the large crowd of people who surged past the police line into the House side of the Capitol:



The defendant was captured in video in this area. *See* Exhibit B. The mob is heard chanting while trying to gain access to the House side of the Capitol. The rioters succeeded to gain access at approximately 2:36 p.m., and the defendant is seen toward the end of the clip, after coming through the police line.  The entire video was posted online by "JaydenX" another Capitol siege defendant, entitled *The Shooting and Storming of the U.S. Capitol in Washington D.C.*  Strong also posted the photograph below of the mob in this area on iCloud account:



Strong was captured by CCTV as he left the Capitol from the Senate Wing at approximately around 2:50 p.m., about 3 minutes after the doors were breached the second time:



By 2:53 p.m. body worn camera (BWC) footage caught Strong outside on the Upper West Terrace

as he left to go down below:





In total Strong spent approximately 30 minutes inside of the Capitol. At his plea, Strong admitted that he knew he did not have authority to be inside the building.

*Social Media Posts*

Strong has several social media accounts, many from which he was blocked before the January 6 riots. On February 18, 2021, he posted the following statement on Facebook:

> Try being blocked from Facebook for three months and then starting a new account with a new phone number.  Not only that, but being blocked on Twitter, Parler, USA. Life, and Instagram too.

However, on December 31, 2020, six days before he went to Washington D.C. for the Stop the Steal rally Strong posted on Parler that he "…is not obeying that curfew. Plus, the red strip on the bottom of my ID gets me through any police barricade!" Two days earlier, Strong posted "I'll be there to fight and represent my fellow QANON's and Conservative of Southern California." On November 20, 2020, he posted that the "Election was a definite [a] RIGGED ELECTION!"

*Kevin Strong's Interview and Cooperation*

Strong voluntarily agreed to an interview with the FBI at the time of his arrest. Strong admitted flying to Washington D.C. to attend the Stop the Steal rally of former President Trump.

14

He met another person whom Strong determined to be a fellow QAnon supporter like himself. Strong gave the FBI this person's name and state of residence.

After the speeches were over, the two men went with the crowd to the Capitol grounds. Strong said he saw police removing barricades and, as he perceived it, waving people inside the building.  He admitted going inside the Capitol and that he walked on the first and seconds floors and in the Rotunda. Strong also told the FBI he took a selfie in front of Speaker Pelosi's office but deleted it.[2]  He kept several photos and videos taken inside the Capitol and showed them to the FBI.  Strong admitted that he saw people breaking and damaging things while inside the building.[3] Lastly, Strong identified himself in a still photo taken from a CNN broadcast and showed the agents the QAnon hat he wore on January 6, 2021 while inside the Capitol. A large part of Strong's interview involved his adherence to QAnon ideology which he described as a group working in conjunction with the White House and military intelligence. He stated he believed a new political party, the Patriot Party, was coming and that the leaders of QAnon were working with high-level U.S. civilian and military leaders to obtain alien technology. He also told the FBI he believed that President Trump would ultimately remain the leader of the U.S. indefinitely. He also told the agents he believed China, ISIS and ANTIFA were going to invade the U.S., and everyone should be prepared for war.

*The Charges and Plea Agreement*

On January 21, 2021, Kevin Strong was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On January 22, 2021, he was arrested at his home in Beaumont, California. On February 1, 2021, Strong was charged by four-

---

[2] Such a photograph was not found during the search of Strong's telephone.  The date he deleted this photograph is unknown, but appears to have been before he was interviewed by the FBI on January 22, 2021.
[3] No photographs showing rioters damaging property inside the building were recovered from Strong's telephone.

count Information with 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On July 23, 2021, he pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating and Picketing in a Capitol Building. By plea agreement, Strong agreed to pay $500 in restitution to the Architect of the Capitol.

## II.        Statutory Penalties

Strong now faces a sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Strong faces up to six months of imprisonment and a fine of up to $5,000. Strong must also pay restitution under the terms of his or her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it, nor is supervised release available. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## III.       Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). After considering these factors a 14-day sentence of incarceration followed by a 36-month term of probation is an appropriate punishment in this case.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events. While each defendant should be sentenced based on their individual conduct, as we now discuss, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air. No rioter was a mere tourist that day. Photographs taken by Strong showed the hundreds of people outside the Capitol building, many waving various types of flags while uniformed officers on the steps watched the crowd.

Additionally, while looking at Strong's individual conduct, this Court should assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated

sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had Strong personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct. That Strong did not engage in violent or destructive acts is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish Strong from most other misdemeanor defendants.  Strong's lack of violence and property destruction explains why he was charged only with, and permitted to plead to, a misdemeanor rather than felony.

 Strong went to the Capitol, and by his own admission, saw barricades and police outside. He saw people climbing the scaffolding.  He went to the Upper West Terrace and then entered through the Senate Wing Doors where glass from the broken windows and doors lay on the ground, inside and out. Yet he continued into the building and by his own admission saw rioters inside doing damage to property.  As Strong entered the Rotunda, he saw a plain clothes officer watching as the crowd started pouring inside. He was with the crowd that broke through the police line and entered the House side of the Capitol, and he wandered the halls by Speaker Pelosi's suite of offices, a space which, according to the U.S. Capitol Police, is not open to the public.  He was in the same hallway where staffers ran to into a conference room and barricaded the door, to hide from the mob.

Importantly, Strong abused a position of trust. On January 6, 2021, he employed by the FAA as an Electronics Technician.  His supervisor told the FBI that Strong was an Electronics Technician who had access to several area airports near Ontario, California.  The FBI also interviewed a legal point of contact and head security officer for the FAA with knowledge of Strong's position. They indicated Strong had no government clearance, but his job entailed

maintenance of mission critical equipment. His specialty was navigational aid and communications. Strong maintained and assisted with navigation systems for pilots and airplanes landing/taking off from airports, as well as for transmitter/receiver communication devices. Strong's "badge" did have a red stripe as he boasted in online posts, but that stripe was for access to areas suffering from major devastation not to get him past police barricades into restricted areas on January 6, 2021 in Washington, D.C.

Strong's job was to ensure safe and reliable flow of air traffic for the United States government, yet he chose not to "protect and defendant the Constitution" of that government, but to violate the very tenets of our democracy. Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B. Strong's History and Characteristics

As set forth in the PSR, Strong has no criminal history. PSR, ECF 45 ¶¶ 23-29. He has been compliant while on release. Id. at ¶ 9. He has been employed by the FAA as an air transportation specialist since 2009 and is presently suspended without pay. Id. at ¶¶ 50-51.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[4] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the

---

[4] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2) (B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that

democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters— especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

At the time of the Capitol riot, Strong was employed by the federal government, and yet he participated in a mob effort to stop that government's elected representatives from doing their Constitutional duty.  His social media posts show he believed he could pass through police barricades because of his FAA identification. He went inside the Capitol despite walking past police and barricades and the signs of forced entry exhibited at the Senate Wing doors. Strong's actions and posts establish a need to deter him from doing this again.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with

Congress.[5] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan). Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not become the default.[6] *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth).

The government and the sentencing courts have already begun to make meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of

---

[5] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants. That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[6] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097 (PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

Strong has pleaded guilty to Count Four of the Information, charging him with parading, demonstrating, and picketing in a Capitol Building, a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long he remained inside, the nature of any statements he made (on social media or otherwise), whether he destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences.   And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement.   *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with

significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court may also consider the sentence imposed on the individuals discussed below for reference:

In September 2021, Derek Jancart and Erik Rau were sentenced after pleading guilty in July to Title 40, U.S.C. 5104 (e)(2)(D). Jancart came to the Capitol with a gasmask and a radio; posted a video in which Rau said "we have you surrounded"; made post January 6th statements suggesting violence; and deleted incriminating materials.  Rau brought a medical kit and gloves; videotaped his statement above; went into the Speaker's conference room; and deleted incriminating materials. The government recommended 45 days of incarceration for each, which the Court imposed. *See United States v. Jancart and Rau*, 21-CR-148-JEB.

In *United States v. Leonard Gruppo*, 21-CR-391(BAH), the defendant was a 28-year army veteran who entered for a short time (6 minutes) and who ignored the commands of law enforcement.  Like Strong, he destroyed his photos/videos but also scaled a small wall on the way into the Capitol. Gruppo had ignored law enforcement commands during the riot.  Gruppo received a sentence of 24 months' probation, 90 days of home detention, a $3,000 fine, $500 restitution, and a location monitoring condition.

In *United States v. Tam Pham*, 21-CR-109 (TJK) the defendant, an active-duty Houston, Texas police officer, entered the Capitol building for about 20 minutes and went into an office space, a sensitive area like the Speakers Suite hallway Strong entered.  Like Strong, Pham deleted photos from his phone. He received a sentence of 45 days incarceration. Both Pham and Strong held positions of trust as employees of governmental agencies.

Andrew Ericson was inside for about 15 minutes, half the time Strong was inside, but he entered the House Speaker's conference room on the second floor (a sensitive space like the Speaker's Suite hallway Strong entered), posted a photo of himself with his feet on the conference table and took a beer from the refrigerator. He posted on Snapchat while cheering on criminal activity, while Strong posted he wanted a meme about "fighting" on January 6th. Strong also bragged on social media that his badge could get him past police barricades. The Government had recommended 60 days incarceration however the Court 24 months of probation with 20 days incarceration, on consecutive weekends. *See United States v. Andrew Ericson*, 21-CR 506 (TNM).

In *United States v. Nichols Perretta*, 21-CR-539 (TSC). Perratta went inside for 15-30 minutes after seeing an assault of an officer outside the building. Strong had seen officers and barricades outside and like while Perretta may have entered close in time to a breach, it is clear Strong entered within minutes after the first breach of the Senate Wing Doors.  Perratta received a sentence of 30 days' incarceration.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize

and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

### IV.     The Court's Lawful Authority to Impose a Split Sentence

The sentence requested by the government—14 days of incarceration followed by a term of 36 months of probation—is a lawful one. A sentencing court may impose a "split sentence"— "a period of incarceration followed by period of probation," Foster v. Wainwright, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011) (citation omitted)—for a defendant convicted of a federal petty offense, such as the crime at issue in this case. See 18 U.S.C. § 3561(a)(3). In addition, for a defendant convicted of any federal offense, a sentencing court may impose incarceration for a brief interval as a condition of probation under 18 U.S.C. § 3563(b)(10).

a.     A sentence imposed for a petty offense may include both incarceration and probation.

i.     Relevant Background

In 1984, Congress enacted the Sentencing Reform Act, which in substantial part remains the sentencing regime that exists today. See Pub. L. No. 98–473, §§211-212, 98 Stat 1837 (1984), codified at 18 U.S.C. § 3551 et seq.; see Mistretta v. United States, 488 U.S. 361, 365-66 (1989) (noting that the Sentencing Reform Act of 1984 wrought "sweeping changes" to federal criminal sentencing). That legislation falls in Chapter 227 of Title 18, which covers "Sentences." Chapter 227, in turn, consists of subchapter A ("General Provisions"), subchapter B ("Probation"),

subchapter C ("Fines"), and subchapter D ("Imprisonment). Two provisions—one from subchapter A and one from subchapter B—are relevant to the question of whether a sentencing court may impose a term of continuous incarceration that exceeds two weeks followed by a term of probation, such as the sentence requested by the United States here.

First, in subchapter A, 18 U.S.C. § 3551 sets out "[a]authorized sentences." Section 3551(a) makes clear that a "defendant who has been found guilty of" any federal offense "shall be sentenced in accordance with the provisions of" Chapter 227 "[e]xcept as otherwise specifically provided." 18 U.S.C. § 3551(a). Section 3551(b) provides that a federal defendant shall be sentenced to "(1) a term of probation as authorized by subchapter B; (2) a fine as authorized by subchapter C; or (3) a term of imprisonment as authorized by subchapter D." 18 U.S.C. § 3551(b). As a general matter, therefore, "a judge must sentence a federal offender to either a fine, a term of probation, or a term of imprisonment." United States v. Kopp, 922 F.3d 337, 340 (7th Cir. 2019).

Second, 18 U.S.C. § 3561, the first provision in subchapter B, addresses a "[s]entence of probation." As initially enacted, Section 3561 provided that a federal defendant may be sentenced to a term of probation "unless . . . (1) the offense is a Class A or Class B felony and the defendant is an individual; (2) the offense is an offense for which probation has been expressly precluded; or (3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense." Pub. L. No. 98-473, at § 212; see United States v. Anderson, 787 F. Supp. 537, 539 (D. Md. 1992) (noting that the Sentencing Reform Act did not permit "a period of 'straight' imprisonment . . . at the same time as a sentence of probation").

Congress, however, subsequently amended Section 3561(a)(3). In 1991, Congress considered adding the following sentence to the end of Section 3561(a)(3): "However, this paragraph does not preclude the imposition of a sentence to a term of probation for a petty offense

if the defendant has been sentenced to a term of imprisonment at the same time for another such offense." H.R. Rep. 102-405, at 167 (1991). Instead, three years later Congress revised Section 3561(a)(3) by appending the phrase "that is not a petty offense" to the end of the then-existing language. See H.R. Rep. No. 103-711, at 887 (1994) (Conference Report). In its current form, therefore, Section 3561(a)(3) provides that a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3).

    ii.    Analysis

Before Congress passed the Sentencing Reform Act of 1984, sentencing courts could impose a split sentence on a federal defendant in certain cases. See United States v. Cohen, 617 F.2d 56, 59 (4th Cir. 1980) (noting that a sentencing statute enacted in 1958 had as its "primary purpose . . . to enable a judge to impose a short sentence, not exceeding sixth months, followed by probation on a one count indictment"); see also United States v. Entrekin, 675 F.2d 759, 760-61 (5th Cir. 1982) (affirming a split sentence of six months' incarceration followed by three years of probation). In passing the Sentencing Reform Act, Congress sought generally to abolish the practice of splitting a sentence between imprisonment and probation because "the same result" could be accomplished through a "more direct and logically consistent route," namely the use of supervised release as set out in 18 U.S.C. §§ 3581 and 3583. S. Rep. No. 225, 1983 WL 25404, at *89; accord United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 5B1.1, Background. But Congress's 1994 amendment to Section 3561(a)(3) reinstated a sentencing court's authority to impose a split sentence for a petty offense.

Under 18 U.S.C. § 3561, a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different

offense that is not a petty offense." 18 U.S.C. § 3561(a)(3). Thus, for any federal offense other than a petty offense, Section 3561(a)(3) prohibits "imposition of both probation and straight imprisonment," consistent with the general rule in Section 3551(b). United States v. Forbes, 172 F.3d 675, 676 (9th Cir. 1999); see United States v. Martin, 363 F.3d 25, 31 (1st Cir. 2004); United States v. Harris, 611 F. App'x 480, 481 (9th Cir. 2015); Anderson, 787 F. Supp. at 539.

But the statutory text of 18 U.S.C. § 3561(a)(3) goes further by permitting a court to sentence a defendant to a term of probation "unless" that defendant "is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3). It follows that when a defendant is sentenced for a petty offense, that defendant may be sentenced to a period of continuous incarceration and a term of probation. See United States v. Posley, 351 F. App'x 807, 809 (4th Cir. 2009) (per curiam). In Posley, the defendant, convicted of a petty offense, was sentenced to two years of probation with the first six months in prison. Id. at 808. In affirming that sentence, the Fourth Circuit concluded that Section 3561(a)(3) "[u]nquestionably" provided statutory authority to sentence the petty-offense defendant to "a term of six months of continuous imprisonment plus probation." Id. at 809; see Cyclopedia of Federal Procedure, § 50:203, Capacity of court to impose probationary sentence on defendant in conjunction with other sentence that imposes term of imprisonment (3d ed. 2021) ("[W]here the defendant is being sentenced for a petty offense, a trial court may properly sentence such individual to a term of continuous imprisonment for a period of time, as well as a sentence of probation.") (citing Posley); see also Wright and Miller, Federal Practice and Procedure, § 547, at n.13 (4th ed. 2021) ("A defendant may be sentenced to probation unless he . . . is sentenced at the same time to imprisonment for an offense that is not petty.") (emphasis added).

Nor does the phrase "that is not a petty offense" in Section 3561(a)(3) modify only "different offense." Section 3561(a)(3) does not state "the same offense or a different offense that is not a petty offense," which would imply that the final modifier—i.e., "that is not a petty offense"—applies only to "different offense." The phrase "that is not a petty offense" is a postpositive modifier best read to apply to the entire, integrated phrase "the same or a different offense." See Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 148 (2012). Had Congress sought to apply the phrase "not a petty offense" solely to "different offense," the "typical way in which syntax would suggest no carryover modification" would be some language that "cut[s] off the modifying phrase so its backward reach is limited." Id. at 148-49. And while the indefinite article "a" might play that role in other contexts (e.g., "either a pastry or cake with icing" vs. "either a pastry or a cake with icing"), the indefinite article in Section 3561(a)(3) merely reflects the fact that the definite article before "same" could not naturally apply to the undefined "different offense."

Permitting a combined sentence of continuous incarceration and probation for petty offenses is sensible because sentencing courts cannot impose supervised release on petty-offense defendants. See 18 U.S.C. § 3583(b)(3); United States v. Jourdain, 26 F.3d 127, 1994 WL 209914, at *1 (8th Cir. 1994) (unpublished) (plain error to impose a term of supervised release for a petty offense). When Congress in 1994 amended the language in Section 3561(a), it again provided sentencing courts with "latitude," see S. Rep. 98-225, 1983 WL 25404, at *89, to ensure some degree of supervision—through probation—following incarceration.

Section 3551(b)'s general rule that a sentencing court may impose either imprisonment or probation (but not both) does not preclude a sentencing court from imposing a split sentence under Section 3561(a)(3) for a petty offense for three reasons. First, Section 3551(a) notes that the

sentencing provisions described there apply "[e]xcept as otherwise specifically provided." Section 3561(a)(3) does "provide []" "otherwise": it recognizes a carveout for petty offenses.

Second, the more specific permission for split sentences in petty offense cases in Section 3561(a)(3) prevails over the general prohibition on split sentences in Section 3551(b). See Morton v. Mancari, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one."). When Congress enacted the general prohibition on split sentences in Section 3551(b), it had not yet enacted the more specific carveout for split sentences in petty offense cases in Section 3561(a)(3). See supra, at 23 (recounting statutory history). That carveout does not "void" the general prohibition on split sentences in Section 3551(b); rather, Section 3551(b)'s general prohibition's "application to cases covered by the specific provision [in Section 3651(a)(3)] is suspended" as to petty offense cases. Scalia & Garner, supra, at 184. In other words, Section 3551(b)'s prohibition against split sentences "govern[s] all other cases" apart from a case involving a petty offense. Ibid.

Third, to the extent Section 3551(b)'s general prohibition against split sentences conflicts with Section 3561(a)(3)'s permission for split sentences in petty offense cases, the latter, later-enacted provision controls. See Posadas v. Nat'l Bank of N.Y., 296 U.S. 497, 503 (1936) ("Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one."); Scalia & Garner, supra, at 327-329. Where a conflict exists "between a general provision and a specific one, whichever was enacted later might be thought to prevail." Id. at 185. "The "specific provision"—here Section 3561(a)(3)— "does not negate the general one entirely, but only in its application to the situation that the specific provision covers." Ibid. Section 3551(b)'s general prohibition does not operate against the more specific, later-enacted carveout for split sentences in Section 3561(a)(3).

An interpretation of Sections 3551(b) and 3561(a) that a sentencing court "must choose between probation and imprisonment when imposing a sentence for a petty offense," United States v. Spencer, No. 21-cr-147-CKK, Doc. 70 at 5 (Jan. 19, 2022), fails to accord the phrase "that is not a petty offense" in Section 3561(a)(3) any meaning. When Congress in 1994 amended Section 3561(a)(3) to include that phrase, it specifically permitted a sentencing court in a petty offense case to deviate from the otherwise applicable general prohibition on combining continuous incarceration and probation in a single sentence. Ignoring that amended language would improperly fail to "give effect to every clause and word" of Section 3561(a)(3). Marx v. Gen. Revenue Corp., 568 U.S. 371, 385 (2013).

Congress's unenacted language from 1991, see supra at 23, does not suggest that a split sentence is available only where a defendant is sentenced at the same time for two different petty offenses or for two offenses, at least one of which is a petty offense. For one thing, the Supreme Court has regularly rejected arguments based on unenacted legislation given the difficulty of determining whether a prior bill prompted objections because it went too far or not far enough. See Mead Corp. v. Tilley, 490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent.") (citation omitted). Moreover, under that view, every offense other than a petty offense could include some period of incarceration and some period of supervision (whether that supervision is supervised release or probation). Yet so long as a defendant was convicted of two petty offenses, that defendant could be sentenced to incarceration and supervision (in the form of probation). No sensible penal policy supports that interpretation.

It follows that a sentencing court may impose a combined sentence of incarceration and probation where, as here, the defendant is convicted of a petty offense. Here, Sunstrum pleaded guilty to one count of 40 U.S.C. § 5104(d): Stepping on, Climbing, Removing, or Injuring Property on U.S. Capitol Grounds, which is a "petty offense" that carries a maximum penalty that does not exceed six months in prison and a $5,000 fine. See 18 U.S.C. § 19; see United States v. Soderna, 82 F.3d 1370, 1381 n.2 (7th Cir. 1996) (Kanne, J., concurring) (citations omitted) (noting that a petty offender may face a sentence of up to five years in probation).

      b.    A sentence of probation may include incarceration as a condition of probation, though logistical and practical reasons may militate against such a sentence during an ongoing pandemic.

      ii.    Relevant Background

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation." 18 U.S.C. § 3563. Among the discretionary conditions of probation, a sentencing court may impose is a requirement that a defendant remain in the custody of the Bureau of Prisons during nights, weekends, or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release.

18 U.S.C. § 3563(b)(10). Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration as a condition of probation in one of two ways. S. Rep. No. 225, 1983 WL 25404, at *98. First, a court can direct that a defendant be confined in "split intervals" over weekends or at night. Id. Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two." Id.

  ii.  Analysis

  A sentencing court may impose one or more intervals of imprisonment up to a year (or, as here, up to the six-month statutory maximum) as a condition of probation, so long as the imprisonment occurs during "nights, weekends or other intervals of time." 18 U.S.C. § 3653(b)(10). Although the statute does not define an "interval of time," limited case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time. United States v. Mize, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); accord United States v. Baca, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); see also Anderson, 787 F. Supp. At 538 (continuous 60-day incarceration not appropriate as a condition of probation); Forbes, 172 F.3d at 676 ("[S]ix months is not the intermittent incarceration that this statute permits."). Accordingly, a sentence of up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10). That would be an appropriate sentence in this case.

  A sentencing court may also impose "intermittent" confinement as a condition of probation to be served in multiple intervals during a defendant's first year on probation. 18 U.S.C. § 3563(b)(10); see Anderson, 787 F. Supp. At 539. Notwithstanding a sentencing court's legal authority to impose intermittent confinement in this manner, the government has refrained from requesting such a sentence in Capitol breach cases given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic. Those concerns would diminish if conditions improve or if a given

facility is able to accommodate multiple entries and exits without unnecessary risk of exposure. In this case, the government does not request that imprisonment be imposed through "intermittent" confinement as a condition of probation.

**V.    Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Kevin Strong to 14 days incarceration, 36 months of probation, $500 in restitution and 60 hours of community service.   Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his early acceptance of responsibility.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:    /s/ *Mona Lee M. Furst*
MONA LEE M. FURST
KS Bar No. 13162
Assistant United States Attorney
Detailee – FMC Division
U.S. Attorney's Office
555 4th Street, N.W., Room 5840
Washington, D.C.  20530
Office: 316-269-6537
Mona.Furst@usdoj.gov