**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| **UNITED STATES OF AMERICA** | ) | **Crim. No.  21-114 (TJK)** |
| | ) | |
| v. | ) | |
| | ) | |
| **KEVIN STRONG** | ) | |
| | ) | |
| | ) | |

---

## MEMORANDUM IN AID OF SENTENCING

*"Judging is giving too much value on the surface and missing the value beneath."*

― *Dee Dee Artner*

The last 14 months have been one of the most challenging times in Kevin Strong's life. Undoubtedly, the most challenging was when he lost his mother due to breast cancer in 1998, when he was 21 years old.  They were very close and he was by her side as she suffered.  It is still difficult for him to discuss more than 20 years later.

What is also difficult for him to discuss is the impact of his decision on January 6th, 2021 has had on his family, particularly his sons.  It was a simple decision – fly from California to Washington, D.C. to check on his father's rental property and while there, attend former President Trump's rally.  Unlike others, who actually planned to "Stop the Steal" by entering the Capitol intending to look for politicians and incite violence, Kevin went to attend and listen to the speeches.  Like hundreds of others, he had been following and receiving information about the events including fliers stating "Fight for Trump."  He stood amongst the crowd of hundreds of people surrounding him on all sides.  The crowd pushed forward.  Others called for violence. Others yelled at officers.  Others broke glass.  Kevin Strong did not.  He did not raise his hand in protest.  As the swell of the crowd moved forward from outside to inside, he moved forward with the hundreds of others.  It was a simple decision to put one foot in front of the other and keep going forward with the crowd.  Once inside, he was a spectator, watching the crowd of people yelling.  He walked through the Capitol and did not disrupt anything and eventually found his way out in less than 30 minutes.  The gentleman whom he met at the event, and who entered the Capitol with him, has not been charged.

Soon after that day, he was arrested and detained in California.  He was released approximately five days later, after his father was able to pulled together $50,000 for his release. He was immediately suspended from his job at the Federal Aviation Administration, which he had for 11 years.  He was separated the month before from his wife. After January 6th, his wife

filed for divorce and sought full custody, when joint custody had been the plan before January 6th. The divorce is still pending. Supervised visits have been the norm. His sons went from seeing their loving father regularly to court-ordered scheduled supervised visits.

Too much weight has been given to the surface, and missing was it underneath, which is that Kevin Strong is a dedicated father, a hard working government employee, and a contributing member to his community, who had no plan, intention, or thought to take over the government on January 6th. For these reasons, no further incarceration should be imposed which would further take him away from his sons and delay his progress towards being the loving caring father and provider he needs to be for them.

Kevin Strong, through undersigned counsel, hereby respectfully submits this Sentencing Memorandum in anticipation of his sentencing. Based on the nature and circumstances of the offense, his background, acceptance of responsibility, and the relevant sentencing factors pursuant to 18 U.S.C. § 3553(a), the defense respectfully requests a sentence time served or probation, either of which would be a sentence not greater than necessary under the 18 U.S.C. § 3553(a) factors to address his minimal conduct in this case.

## <u>TIMELINE OF JANUARY 6th EVENTS</u>

The decision to attend the rally was not unique to Mr. Strong.  Approximately, 30,000

thousands of people were expected to attend.[1]

**6 a.m.**                    Numerous Trump supporters head towards the rally at the Ellipse and
                               "[m]any began gathering the night before." [2] (See picture below).



**11 a.m.**                   High-profile figures of the Republican Party spoke directing the
                               Trump supporters:
                               • Representative Mo Brooks (R-Ala.) urged "American
                                 patriots" to "**start taking down names and kicking ass**."[3]

---

[1]      Though President Trump boasted that the rally numbered "hundreds of thousands of
people", the rally's organizers projected just 30,000 participants.  *See* Andrew Beaujon, *Here's
What We Know About the Pro-Trump Rallies That Have Permits*, The Washingtonian (Jan. 5,
2021), available at https://www.washingtonian.com/2021/01/05/heres-what-we-know-about-the-
pro-trump-rallies-that-have-permits/.

[2]      George Petras, Janet Loehrke, Ramon Padilla, Javier Zarracina and Jennifer Borresen,
*Timeline: How the storming of the U.S. Capitol unfolded on Jan. 6*, USA Today, Updated Feb. 9,
2021, available at https://www.usatoday.com/in-depth/news/2021/01/06/dc-protests-capitol-riot-
trump-supporters-electoral-college-stolen-election/6568305002/ (last accessed on Feb. 28, 2022).
[3]      *See* Matthew Choi, *Trump is on trial for inciting an insurrection. What about the 12
people who spoke before him?*, Politico (Feb. 10, 2021), available at
https://www.politico.com/news/2021/02/10/trump-impeachement-stop-the-steal-speakers-
467554.

- Katrina Pierson stated, "Americans will stand up for themselves and protect their rights, and they will demand that the politicians that we elect will uphold those rights, or **we will go after them**."[4]
- Amy Kremer, one of the organizers of the "Save America" rally and moderator of the "Stop the Steal" Facebook group, echoed others' calls for Republican lawmakers to challenge the election result and **"punch back from Donald Trump."**[5]
- Lara and Eric Trump, the president's daughter-in-law and son, encouraged the attendees **to march on the Capitol to "stand up for this country and stand up for what's right.**"[6]
- Donald Trump, Jr. narrated that "You have an opportunity today: **You can be a hero, or you can be a zero**. And the choice is yours but we are all watching."[7]
- Rudy Giuliani, President Trump's personal attorney also spoke, making his now-infamous call for "**trial by combat**."[8]

**12 p.m.**          Former President Trump took the stage and implored attendees to "fight" for him, notably stating:

> We will not let them silence your voices. . . **we're going to walk down to the Capitol**, and we're going to cheer on our brave senators and congressmen and women, and we're probably not going to be cheering so much for some of them. . . [if the election is certified], you will have an illegitimate president. That's what you'll have. And we can't let that happen.[9]

**12:30 p.m.**       Before President Trump concluded his speech, some of the rally attendees migrated from the Ellipse toward the Capitol.[10]

---

[4]      *Id.*

[5]      *Id.*

[6]      *Id.*

[7]      *Id.*

[8]      *Id.*

[9]      *See* Brian Naylor, *Read Trump's Jan. 6 Speech, A Key Part Of Impeachment Trial*, NPR (Feb. 10, 2021), available at https://www.npr.org/2021/02/10/966396848/read-trumps-jan-6-speech-a-key-part-of-impeachment-trial.

[10]     *See* Dmitiy Khavin, et al., *Day of Rage: An In-Depth Look at How a Mob Stormed the Capitol*, The New York Times (June 30, 2021), available at

**1:10 p.m.**            Former President Trump continues to implore attendees to "fight" for him:

> And we fight. **We fight like hell. And if you don't fight like hel**l, you're not going to have a country anymore. . . So we're going to, we're going to walk down Pennsylvania Avenue. I love Pennsylvania Avenue. **And we're going to the Capitol**, and we're going to try and give.[11]

**1:10 p.m.**            At the same time, supporters "begin grappling with police on the Capitol steps."[12]



---

https://www.nytimes.com/video/us/politics/100000007606996/capitol-riot-trump-supporters.html; *see also* Shelly Tan, et al., *How one of America's ugliest days unraveled inside and outside the Capitol*, The Washington Post (Jan. 9, 2021), available at https://www.washingtonpost.com/nation/interactive/2021/capitol-insurrection-visual-timeline/.

11      *See* Brian Naylor, *Read Trump's Jan. 6 Speech, A Key Part Of Impeachment Trial*, NPR (Feb. 10, 2021), available at https://www.npr.org/2021/02/10/966396848/read-trumps-jan-6-speech-a-key-part-of-impeachment-trial; see also Petras, *Timeline*, footnote 2 supra, https://www.usatoday.com/in-depth/news/2021/01/06/dc-protests-capitol-riot-trump-supporters-electoral-college-stolen-election/6568305002/ (last accessed on Feb. 28, 2022).

12      Petras, *Timeline*, footnote 2 supra.

**1:30 p.m.**                   After Trump's speech, "supporters being marching toward the U.S. Capitol."[13] See picture below.



**2:07 p.m.**                Kevin Strong was outside of the Upper West Terrace among hundreds of people and took this photo.



---

[13]      Shelly Tan, Youjin Shin and Danielle Rindler, *How one of America's ugliest days unraveled inside and outside the Capitol*, The Washington Post, https://www.washingtonpost.com/nation/interactive/2021/capitol-insurrection-visual-timeline/ (last accessed on Feb. 28, 2022).

| | |
|---|---|
| **2:11 p.m.** | Photographs indicated that supporters moved past the police lines on the west side of the Capitol and others scale the walls.[14] |

- **Kevin Strong did not breach the perimeter or fight officers to get past the perimeter lines.**
- **Kevin Strong did not scale the walls.**



| | |
|---|---|
| **2:20 p.m.** | Kevin Strong enters the Capitol through the Senate Wing doors after numerous (possibly 100) people had already entered.[15] |



---

[14]     Petras, *Timeline*, footnote 2 supra.

[15]     The Court should note that the government provided a 40-second video clip of Mr. Strong at the Senate Wing door.  This clip begins showing numerous people already having entered through the door and walking down the hallway.  Hence, the defense disputes the allegation that Mr. Strong was one of the first people who entered the Capitol.

**2:22:54 p.m.**          Prior to Kevin Strong entering Statuary Hall at 2:23 p.m.,[16] uniformed officers appear to be standing watching the entrance of the hall.  They eventually leave.



**2:22:57 p.m.**          An officer wearing a suit appears to wave in the direction where Kevin Strong will enter a few moments later.



---

[16] The government included clear photos from CCTV footage from the Rotunda.  The defense includes the screenshots from the Statuary Hall video received in discovery, which has a view of the Rotunda.  (See Exhibit 1 via USAfx).

**<u>2:23:05 -2:23:12 p.m.</u>**   The uniformed officers who were watching the entrance of Statuary Hall turn to leave after the officer wearing a suit waved and communicated to them at minute 2:23:06 p.m.



**<u>2:23:15 – 2:23:21 p.m.</u>**   The officer wearing a suit is present as Kevin Strong and his companion enter.



**2:23:25 – 2:23:42 p.m.**    The officer wearing a suit is aware that people are entering.  See Gov't Sent. Memo., ECF No. 47, p. 6.  Kevin Strong and his companion are walking behind him.



**2:24:54 p.m.**    Another uniformed officer with a captain's hat walks past Kevin Strong as he is taking pictures.



2:25 p.m.          Within two minutes of entering Statuary Hall and taking pictures,
                   Kevin Strong and his companion head to exit the Hall.



**2:25:30 p.m.**   Kevin Strong turns around twice and points, appearing to be unsure
                   which direction is the best exit.  Notably, many more people have
                   entered the Statuary Hall entrance.



**2:28 p.m.**                    After attempting to exit to avoid the crowd, Kevin Strong and his companion are back in Statuary Hall and Connector.



**2:28:44 p.m.**          As protestors are shouting at officers and are chanting, Kevin Strong is standing with his hands to his side, not shouting, and simply observing.



**2:29:00 p.m.**          Kevin Strong takes two steps forward and stops to observe.  In the meantime, more and more people are flowing into the building and walking past him.

14

**2:29:06 p.m.**          Kevin Strong again turns around to leave.



**2:29:19 p.m.**     Approximately 13 seconds later, so many people have entered the Hall, it is not possible to exit the way he entered.



**2:29:50 p.m.**           For the next several seconds, Kevin Strong is continuing to walk away from the direction he came since there were so many people. He says nothing and does nothing except walk and observe.



**2:35:48 p.m.**    After joining in a chant with others for two seconds, Kevin Strong is standing with several others with no way to move backwards or forwards.



**2:36 p.m.**    At some point, Mr. Strong is observed on a Jayden X video.  See Gov't Exhibit B.  In the video, Mr. Strong is doing what has been doing the majority of the time – watching and observing, not fighting, not pushing, not yelling, and not advocating violence.  In the picture below, he is talking to officers.



**2:37 p.m.**          Approximately 10 seconds later, Kevin Strong follows his companion toward the yelling to see what is happening.  He does not chant with others.



**2:47 p.m.**          Kevin Strong and his companion eventually make it through the crowd to find their way out of the Capitol Building.



**LEGAL PRINCIPLES**

Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G), is a class B misdemeanor or "petty offense", as defined by 18 U.S.C. § 3559(a)(7), because it carries a maximum incarceration period of six months or less.  The United States Sentencing Guidelines (Guidelines) do not apply to class B misdemeanors.  *See* U.S.S.G. §1B1.9.  In addition, pursuant to 18 U.S.C. § 3583(b)(3), the Court is disallowed from imposing a term of supervised release for a petty offense, and if it imposes active, continuous imprisonment. 18 U.S.C. § 3551 seemingly does not support an additional period of probation to follow.  *See United States v. Torrens et. al.*, Crim. No. 21-cr-204 (BAH), ECF No. 110, 113, & 125.  A sentence of incarceration and probation is not appropriate for the reasons set for in the Amicus Brief of the Federal Public Defender, in *United States v. Jeremiah Caplinger*, No. 21-cr-342 (PLF), ECF No. 53, attached as Exhibit 2.

Since the Guidelines do not apply, the Court is directed to look to 18 U.S.C. § 3553(a) to impose a sentence that is "sufficient, but not greater than necessary, to comply with the purposes [of sentencing]."  The factors enumerated in 18 U.S.C. § 3553(a)(1) include "the nature and circumstances of the offense and the history and characteristics of the defendant."  Additionally, the Court should determine the "need" for the sentence, by considering if and how a term of incarceration would "reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense."  *Id*. at (2)(A).  Moreover, the Court should consider how a sentence would "afford adequate deterrence to criminal conduct," "protect the public from further crimes of the defendant," and "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  *Id*. at 2 (B-D).  Further still, the Court must be mindful of "the kinds of sentences available,"

20

should consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct," and should consider the "need to provide restitution to any victims of the offense."  *Id*. at (3), (6), & (7).

## ARGUMENT

Mr. Strong is a 45-year-old college-educated father with no criminal history, not even a traffic ticket.  While the nature and circumstances of the January 6th events were indeed serious, his particular actions that day, paired with his individual history and characteristics do not lend itself to a sentence of incarceration.  Rather, a sentence of probation and restitution would meet the purposes of sentencing, without being overly punitive.  A probationary sentence would provide adequate deterrence to Mr. Strong, avoid an unwarranted sentencing disparities among other January 6th defendants and is warranted in light of his stellar performance on pretrial release.

### I.    Nature and Circumstances of Mr. Strong's Offense

The events of January 6th are seared into the nation's memory.  That day and the days after resulted in lost lives and over 1 million dollars in property damage.  In addition, it caused trauma to politicians and staffers and their family members who were present there and who watched from a far.

Mr. Strong understands and would never minimalize the impact of the event on the nation.  However, he was not the cause of January 6th, nor was he in the category of people who caused physical harm to others or damage to the Capitol buildings.  He entered the building, but his unlawful entrance cannot, and should not, be conflated with the many other, wider, failures that occurred that day.  Various factors led to the Capitol being breached, including "paralysis" "exacerbated by the patchwork nature of security across a city where responsibilities are split

between local and federal authorities" and "driven by unique breakdowns inside each law enforcement agency."[17]  To characterize Mr. Strong as the proximate cause of the January 6th event fails to acknowledge these other failures, and places an unjust blame on one non-violent, non-destructive individual.  The American system of justice, and specifically 18 U.S.C. § 3553(a), directs this Honorable Court to look at every defendant and every defendant's actions individually.  *See Kimbrough v. United States*, 552 U.S. 85, 90 (2007); *Gall v. United States*, 552 U.S. 38 (2007).

As stated above, Mr. Strong traveled and attended the rally alone and then found a companion.  Both he and his companion walked from the rally into the Capitol building.  Mr. Strong did not break any windows or forcibly enter the Capitol.  He walked through a previously breached door.  He took pictures and is observed on CCTV footage walking, observing, and taking pictures.  After the event, Mr. Strong was questioned by the FBI and voluntarily provided them with pictures and videos to assist in their investigation.  In addition, he provided the name and contact information for his companion.  The companion has not been charged.

The government places great weight on Mr. Strong's reference to his FAA badge having a red stripe.  He indicated that his badge had a rest stripe to allow him to pass barricades during emergencies such as an earthquake.  There is no indication that he used the badge to enter the Capitol.  Hence, the government's allegation that he abused the trust of his office is unfounded. The government also places great weight on Mr. Strong's voluntary discussion with law enforcement about QAnon.  The effectiveness of online political propaganda has been well-

---

[17]      *See* Jacqueline Alemany, et. al., *Before, During, and After Bloodshed*, The Washington Post (Oct. 31, 2021), available at https://www.washingtonpost.com/politics/interactive/2021/what-happened-trump-jan-6-insurrection/?itid=hp-top-table-main.

documented.  For a former QAnon believer, "[t]the [QAnon] theories were fiction, but they hooked into an emotional vulnerability that sprang from something real. For [the former believer], it was a feeling that the Democratic Party had betrayed her after a lifetime of trusting it deeply."[18]

Regardless of what led Mr. Strong to the Capitol, it is clear that he did not engage in destructive behavior inside the Capitol.  Nonetheless, Mr. Strong has admitted guilt and is remorseful for his conduct.

## II.   Mr. Strong's History and Characteristics

As stated above, Mr. Strong is a father, a son, a college graduate, and was a government employee for 11 years.  For more than one year, Kevin Strong has been living with his father and his uncle, until his uncle passed away.  Kevin's father describes how his presence has allowed his father (and his uncle) to remain in his home.  Kevin takes him to doctor's appointments, assists him with medication, shops for him, and cleans and cooks and he did the same for his uncle.  His father describes how Kevin is remorseful -- "A day doesn't go by where [Kevin] revisits the incident with me and wishes he had not entered the Capitol."[19]

His other family members describe him as a "dedicated" family man[20] and a person who is "loving, supportive, and very caring."[21]  He makes time to take care of those in need.  A coworker explains that Kevin is a "very kind gentle giant," who has "always given his help to anyone who asks for assistance."[22]  Another close friend describes that not only is Kevin a "very

---

[18]     Sabrina Tavernise, *One woman's journey out of QAnon: 'Trump just used us and our fear,'* Chicago Tribune, Jan. 29, 2021, available at https://www.chicagotribune.com/nation-world/ct-nw-nyt-qanon-fallout-20210129-vzm5spr5szbafd47c3dtxhvrju-story.html.

[19]     Letter from Father, R. S., Exhibit 3.

[20]     Letter from Aunt, D. S., Exhibit 4.

[21]     Letter from Uncle, R. S., Exhibit 5.

[22]     Letter from Coworker-1, Exhibit 6.

kind and gentle person," but also that he "has a deep sense of family, faith, and community."[23]

Kevin's pastor provides particular insight into his remorse, explaining that "[Kevin's] regret and

repentance is sincere."  Notably, his pastor stated,

> As a Christian pastor, I strongly believe in the rule of law and the necessity of
> justice for our society to properly function and prosper. I also believe that justice
> can be tempered with mercy, and I have seen the power of the "second chance" in
> the lives of many people in my 25 years as a minister.[24]

Mr. Strong has no criminal record, no prior arrest, and not even a traffic infraction.  He

does not use illicit substances and does not consume alcohol.

Mr. Strong's two sons are the apple of his eye.  His uncle describes how Kevin's sons

have many positive traits that have been instilled him them by Kevin and their mother.   Mr.

Strong seeks to provide more stability for his sons.  In light of his need to work, provide, and

care for his family, Mr. Strong seeks a probationary sentence.

### III.    A Probationary Sentence Would Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense.

18 U.S.C. § 3553(a)(2)(A) provides that the Court must assess "the need for the sentence

imposed— . . . to reflect the seriousness of the offense, to promote respect for the law, and to

provide just punishment for the offense."  Incarceration is not required in order for a sentence to

reflect the seriousness of the offense.  "A sentence of probation rather than incarceration can

work to promote the sentencing goal of respect for the law by illustrating a rejection of the view

that the law is merely a means to dispense harsh punishment without taking into account the real

conduct and circumstances involved in sentencing."  *United States v. Bennett*, No. 8:07CR235,

2008 U.S. Dist. LEXIS 45302, at *12 (D. Neb. May 30, 2008) (citing *Gall*, 552 U.S. at 99).

---

[23]    Letter from Friend, B.B., Exhibit 7.
[24]    Letter from Pastor, Exhibit 8.

To determine a just punishment for Mr. Strong, the Court must consider the conditions under which an individual will serve time if the Court decides to incarcerate the individual. Since the beginning of the COVID-19 pandemic, the virus spread rampantly in detention facilities. Thousands of BOP inmates have tested positive for COVID-19 and the latest BOP numbers show that 271 inmates have died from COVID-19.[25]   With the rise of COVID-19 variants, the risks of contracting the virus and death remain a serious concern for inmates.

**IV.   A Probationary Sentence Would Provide Adequate Deterrence to Criminal Conduct and Protect the Public from the Unlikely Chance of Further Crimes of Mr. Strong.**

Under 18 U.S.C. § 3553(a)(2)(B) and (a)(2)(C), this Court must also consider "the need for the sentence imposed—. . . to afford adequate deterrence to criminal conduct...[and] to protect the public from further crimes of the defendant." The public has been protected while Mr. Strong has been on pretrial release. For the last fourteen (14) months, Mr. Strong has fully complied with supervision requirements. The public will be protected while Mr. Strong is being supervised by the Probation Officer, which will further deter any criminal conduct.

While "[p]rison is an important option for incapacitating and punishing those who commit crimes," evidence suggests that lengthy prison sentences do not have a "chastening" effect and "produce at best a very modest deterrent effect." *Five Things About Deterrence*, Nat'l Inst. Justice, U.S. Dep't of Justice, 1-2 (May 2016). With respect to specific deterrence, research shows conclusively that "[t]he *certainty* of being caught is a vastly more powerful deterrent than the punishment," that "[s]ending an individual convicted of a crime to prison isn't a very effective way to deter crime," and that "[i]ncreasing the severity of punishment does little to

---

[25] *See* Fed. Bureau of Prisons, *COVID-19 Cases*, https://www.bop.gov/coronavirus/ (last accessed December 8, 2021).

deter crime." *Id.* (emphasis in original); *see also* James Austin *et al.*, *How Many Americans Are Unnecessarily Incarcerated?*, Brennan Ctr. For Just., N.Y. Univ. School of Law, 22 (2016) (quoting a 2011 study by criminologists concluding that "across all offenders, prisons do not have a specific deterrent effect.  Custodial sentences [jail and prison] do not reduce recidivism more than noncustodial sanctions.").  No incarceration is needed to deter criminal conduct in this case.

**V.**    **Sentence of Probation Would Not Create An Unwarranted Sentencing Disparity**

Sentencing Mr. Strong to probation would not contribute to an unwarranted sentencing disparity.  Although the majority of the January 6th cases are unresolved, this Honorable Court can look to other sentencing judgments to determine an appropriate sentence in this case. January 6th defendants in other cases who pled to the *exact* same criminal charge with the *same* minimal criminal history have received probationary sentences.  *See United States v. Anna Morgan-Lloyd*, Crim. No. 21-cr-00164 (sentenced to 36 months' probation); *United States v. Valerie Ehrke*, Crim. No. 21-cr-00097 (36 months' probation); *United States v. Danielle Doyle*, Crim. No. 21-cr-00324 (2 months' probation); *United States v. Eliel Rosa*, Crim. No. 21-cr-00068 (12 months' probation); *United States v. Vinson, et al.*, Crim. No. 21-cr-0355 (5 years' probation); *United States v. Andrew Wrigley*, Crim. No. 21-cr-42 (18 months' probation).

## <u>Conclusion</u>

Considering the § 3553(a) sentencing factors, a probationary sentence, and restitution in the amount of $500, is a sufficient, but not greater than necessary, sentence to satisfy the purposes of sentencing.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
Ubong E. Akpan
Assistant Federal Public Defender
625 Indiana Ave., N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500
