IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA             CR No. 1:21-cr-00114-TJK-1

v.                                   Washington, D.C.
                                     Monday, March 7, 2022
KEVIN STRONG,                        9:00 a.m.
          Defendant.
- - - - - - - - - - - - - - - x
_____

TRANSCRIPT OF SENTENCING
HELD BEFORE THE HONORABLE TIMOTHY J. KELLY
UNITED STATES DISTRICT JUDGE
_____

APPEARANCES:

For the United States:    Mona Furst, Esq.
                          DOJ-USAO
                          Office of the United States Attorney
                          301 North Main
                          Suite 1200
                          Wichita, KS 67052
                          (316) 269-6481


For the Defendant:        Ubong E. Akpan, Esq.
                          FEDERAL PUBLIC DEFENDER
                          FOR THE DISTRICT OF COLUMBIA
                          625 Indiana Avenue, NW
                          Suite 550
                          Washington, DC 20004
                          (202) 208-7500


Court Reporter:           Timothy R. Miller, RPR, CRR, NJ-CCR
                          Official Court Reporter
                          U.S. Courthouse, Room 6722
                          333 Constitution Avenue, NW
                          Washington, DC 20001
                          (202) 354-3111


Proceedings recorded by machine shorthand; transcript
produced by computer-aided transcription.

1                    **P R O C E E D I N G S**

2              THE DEPUTY CLERK:  Your Honor, this is Criminal

3      Matter 21-114, United States of America v. Kevin Strong.

4              Present for the Government is Mona Furst; present

5      from the United States Probation Office is Sherry Baker;

6      present for the defendant is Ubong Akpan; also present is

7      the defendant, Mr. Strong.

8              THE COURT:  All right.  Well -- testing, testing,

9      testing, testing.  There we go.

10             All right.  Good morning, everyone.

11             We are here for Mr. Strong's sentencing.

12             I have received and reviewed the presentence

13     report and the sentencing recommendation from the Probation

14     Office; I've seen -- I've received, of course, the

15     sentencing memoranda from the Government and the defendant,

16     to include a number of exhibits in each case; and, of

17     course, I've reviewed the videos that the Government -- the

18     video clips that the Government have submitted, as well.

19             Are there any other documents or materials for me

20     to review, Ms. Akpan?

21             MS. AKPAN:  Good morning, Your Honor.  Yes, I also

22     submitted a video through USAfx.

23             THE COURT:  Hmm.  All right.  I want to make sure

24     that I've seen -- can you describe --

25             MS. AKPAN:  It's --

```
1            THE COURT:  -- its contents.
2            MS. AKPAN:  It's of Mr. Strong in Statuary Hall.
3            THE COURT:  Oh, yes.  Yes --
4            MS. AKPAN:  Okay.  Thank you.
5            THE COURT:  -- I watched that.
6            MS. AKPAN:  Okay.
7            THE COURT:  Yes, yes, yes.  So all of those
8     videos, I have seen, as well.
9            Ms. Furst, are there any other materials for me to
10    review?
11           MS. FURST:  No, Your Honor.
12           THE COURT:  All right.  And just, I guess, for the
13    record, are both counsel vaccinated?
14           MS. AKPAN:  (Indicates affirmatively.)
15           MS. FURST:  (Indicates affirmatively.)
16           THE COURT:  All right.  So if you want to come up
17    just, again, so we get a good -- we can hear you on the
18    record, when you come up to the podium, you're free to take
19    your mask off and speak into the podium [sic].
20           MS. FURST:  There are no other things that we have
21    to offer, Your Honor, other than what you've noted.
22           THE COURT:  All right.  Very well.
23           Is the defendant vaccinated?
24           THE DEFENDANT:  (Indicates negatively.)
25           THE COURT:  All right.  So if he is going to
```

1   address me -- which, obviously, is his choice -- Ms. Akpan,

2   we've set up that podium there for him to use in that event.

3   So -- all right.  Very well.

4           Mr. Strong, this sentencing hearing will proceed

5   in four steps, and all the while, I want you to keep in mind

6   the seriousness of why we are here today.  You pled guilty

7   to a federal crime, and today's proceeding is about the

8   consequences that you'll face as a result of your decision

9   to commit that crime.

10          The first step of today's hearing is for me to

11  determine whether you have reviewed the presentence report

12  and the -- whether there are any outstanding objections to

13  that report and, if so, to resolve those objections.

14          The second step is usually for me to determine

15  what the sentencing guidelines -- what sentencing guidelines

16  range applies in your case based on your criminal history

17  and considering any mitigating or aggravating factors that

18  may warrant a departure under the federal sentencing

19  guidelines manual, but, of course, the crime to which you've

20  committed -- to which you've pled guilty is a misdemeanor,

21  so the sentencing guidelines don't apply, but even so, I'll

22  clarify the sentencing framework we are operating under in

23  terms of what the potential penalties are.

24          The third step is I'll hear from the Government,

25  from your counsel, and from you if you wish to be heard

1    about the sentencing in this case.

2          And then the last step requires me to fashion a

3    just and fair sentence in light of the factors Congress has

4    set forth in 18 United States Code 3553(a), and as part of

5    that last step, I will actually impose the sentence along

6    with other required consequences of the offense.

7          All right.  The final presentence report and

8    sentencing recommendation were filed in this matter on

9    February 28th.

10          And let me ask you first, Ms. Furst.  Does the

11    Government have any objection to any of the factual

12    determinations set forth in the presentence report at all?

13          MS. FURST:  I do not, Your Honor.  Thank you.

14          THE COURT:  All right.  Very well.

15          And, Ms. Akpan, have you and your client read and

16    discussed the presentence report?  And do you have any

17    objection -- you or he have any objection to the factual

18    statements set forth in that report?

19          MS. AKPAN:  No objection to the factual statement

20    and only those that we submitted to the Probation Office.

21    Thank you, Your Honor.

22          THE COURT:  All right.  Very well.

23          Mr. Strong, there's a few questions I need to ask

24    you, and you can just address me from right there --

25    actually, you can do it from your table right there at the

1      moment.

2              Mr. Strong, have you had enough time to -- well,

3      first, let me just ask, are you completely satisfied with

4      the services of your attorney in this case, sir?

5              THE DEFENDANT:  Yes, Your Honor.

6              THE COURT:  All right.  And have you had enough

7      time to talk with her about the presentence report and the

8      papers the Government submitted in connection with our

9      sentencing here today?

10             THE DEFENDANT:  Yes, Your Honor.

11             THE COURT:  All right.  Very well.  So I will

12     accept the facts as stated in the presentence report and the

13     presentence report will be my findings of fact for the

14     purposes of this sentencing.

15             The second step, again, which would ordinarily be

16     determination of the guidelines, but what we'll -- what I'll

17     use it to do is just, sort of, walk through the statutory

18     sentencing framework that applies in this case.

19             First, as a preliminary matter, Congress has

20     imposed a statutory maximum sentence for the offense to

21     which Mr. Strong has pled guilty.  The maximum -- the

22     statutory maximum is six months' incarceration for this

23     Class B misdemeanor.

24             As far as probation goes, under 18 United States

25     Code 3561(c)(2), the defendant is eligible for up to five

1    years of probation because the offense is a misdemeanor.

2            As far as fines go, the maximum fine for this

3    offense is $5,000.

4            And there is also a mandatory special assessment

5    of $10 under 18 United States Code Section 3013(a).

6            As far as supervised release goes, under 18 United

7    States Code Sections 19 and 3583(b)(3), supervised release

8    is not applicable here.

9            There is an open question about whether I can

10   impose a split sentence of jail and probation, but I'm going

11   to put that aside and resolve it only if I otherwise would

12   have thought that a split sentence is appropriate.

13           So have I accurately stated the statutory

14   framework under which we're operating in this case,

15   Ms. Furst?  Sorry to make you --

16           MS. FURST:  That's okay.

17           THE COURT:  -- get up.  And if you can pull the

18   mic a little bit closer to your mouth so we -- yes.

19           MS. FURST:  Your Honor, you've stated it

20   accurately.

21           THE COURT:  All right.  Perfect.

22           Ms. Akpan, same question to you.

23           MS. AKPAN:  Accurately stated, Your Honor.  Thank

24   you.

25           THE COURT:  All right.  I must now consider the

1    relevant factors that Congress set out in 18 United States

2    Code 3553(a) and I must ensure that I impose a sentence

3    sufficient but not greater than necessary to comply with the

4    purposes of sentencing.  Those purposes include the need for

5    the sentence imposed to reflect the seriousness of the

6    offense, to promote respect for the law, and to provide just

7    punishment for the offense.  The sentence should also afford

8    adequate deterrence to criminal conduct, protect the public

9    from future crimes of the defendant, and promote

10   rehabilitation.  And in addition to the guidelines and

11   policy statements, I must consider the nature and

12   circumstances of the offense; the history and

13   characteristics of the defendant; the need for the sentence

14   imposed to comply with the purposes I just mentioned; the

15   kinds of sentences available; I have to consider the need to

16   avoid unwanted sentence disparities among defendants with

17   similar records who have been found guilty of similar

18   conduct; and I need to consider the need to provide

19   restitution to any victims of the offense.

20           So Ms. Furst, let me hear from you first on

21   application of the factors set forth in Section 3553(a) and

22   otherwise to hear the Government on its sentencing

23   recommendation.

24           MS. FURST:  Thank you, Your Honor.

25           As you know, the events of January 6th, 2021, will

1    forever be burned into the collective memory of our

2    citizens.  A crowd watching their president at a rally to

3    protest the 2020 presidential election turned into an angry,

4    violent mob by the time the rioters made it to the Capitol

5    grounds.  Vice President Pence was inside under Secret

6    Service protection and Congress was in session to certify

7    the results of that presidential election.  The people at

8    the Capitol that day were upset.  They were upset about the

9    election and believed that it had been fraught with fraud

10   and that they needed to address that fraud with their

11   elected officials; however, by "address Congress," the mob

12   actually meant to disrupt the constitutionally required

13   business of Congress and stop the certification.  The mob's

14   addressing of Congress caused tear gas to be deployed,

15   alarms on sealed doors to be activated, damage to property,

16   violent assaults against officers, and deaths.

17          The defendant chose voluntarily to attend this

18   rally called Stop the Steal.  At the rally, speakers

19   encouraged the crowd to go to the Capitol and stop the

20   certification of the 2020 presidential election.  The

21   defendant was there to fight for the former president.  That

22   was clear by his posting a meme from the Mad Max: Fury Road

23   entitled Fight for Trump, Washington, D.C., January 6th.  As

24   the D.C. Court of Appeals recounted in Trump v. Thompson

25   decided December 9th of 2021, President Trump told that

1    crowd, in which the defendant was watching, that the

2    election was rigged and stolen.  He announced to his

3    supporters that, We're going to walk down Pennsylvania

4    Avenue to the Capitol and we're going to try and give our

5    Republicans the kind of pride and boldness that they need to

6    take back our country.  He urged the crowd to demand that

7    Congress do the right thing and he warned that, You'll never

8    take back our country with weakness.  We fight like hell,

9    and if you don't fight like hell, you're not going to have a

10    country anymore.

11           All around the defendant were chants of "stop the

12    steal"; meaning, stop Mr. Biden from becoming certified as

13    the new president of our United States.  He knew the purpose

14    of the rally that he chose to attend, and he went willingly

15    with the crowd afterward to the Capitol along with another

16    individual that he had met there.  Now, the defense has

17    stated that that person that he was with that day that you

18    see in the videos with him has not been charged.  And as you

19    know, Your Honor, many people are still under investigation.

20    This is far from over.  The fact that one person is charged

21    and another isn't has no bearing on what Mr. Strong did.

22           The defendant observed barricades and saw police

23    in riot gear on the grounds.  In fact, the damage done at

24    the Capitol was all over in plain sight.  There were fallen

25    and broken barriers and bike racks, torn scaffolding as

```
 1    rioters climbed to the upper areas of the upper terrace,

 2    people climbing up walls of the Capitol building, and

 3    tear --

 4               THE COURT:  Ms. --

 5               MS. FURST:  -- gas and smoke in the air.

 6               THE COURT:  Ms. Furst, I don't want to interrupt,

 7    but I do want to say, I have -- I'm pretty familiar with the

 8    scene that day.  So focus me in on what the defendant did

 9    rather than what everybody else did, and I -- not because

10    it's not relevant, but because I'm pretty familiar with

11    it --

12               MS. FURST:  Yes, Your Honor.

13               THE COURT:  -- and, sort of, like, what are the

14    notable things that you think are either exculpatory or

15    inculpatory about, you know -- favorable or not favorable

16    about what he specifically did.

17               MS. FURST:  You stopped me at the right point,

18    Your Honor.

19               THE COURT:  All right.  All right.

20               MS. FURST:  I was getting --

21               THE COURT:  Well --

22               MS. FURST:  -- there.

23               THE COURT:  -- maybe, the wrong point.  So anyway,

24    go ahead.

25               MS. FURST:  Your Honor, this defendant entered the
```

1    Senate wing doors about eight minutes after they were first

2    breached, and the first breach was around 2:12 or 2:13 p.m.

3    He entered about 2:20 p.m.  And as you see in the videos,

4    there's glass on the floor; there's glass outside of the

5    building.  It's obvious that there was damage in order to

6    get into the building.  Nonetheless, he went inside anyway.

7    And then as he left, it was during the second breach of

8    those same doors, the southwest -- the Senate wing doors

9    which were, again, breached by a huge mob at 2:42 p.m., and

10   he was in the building about 30 minutes.  He didn't go

11   through any security.  And this is something that's really

12   important in Mr. Strong's case because, as Your Honor knows,

13   he worked for the FAA and he still does.  He's not presently

14   physically working, but he had a PIV card.  The PIV card

15   is -- as you know, that's what gets you into your federal

16   building workplace.  And, in fact, what I thought was

17   significant is he used that PIV card when he posted online

18   and said, I've got this red stripe on the bottom of my

19   card --

20              THE COURT:  Right.

21              MS. FURST:  -- that will get me past police

22   barriers.

23              THE COURT:  Right, but that wasn't -- I mean, in

24   -- I don't want to endorse that since it doesn't appear to

25   be true, but I think you made the argument in your

1     sentencing memorandum that he abused a -- his position --

2          MS. FURST:  Position --

3          THE COURT:  -- of trust.  And, obviously, there's

4     -- that that's -- that is a provision -- there's a provision

5     in the guidelines that talks about that.  We're not talking

6     about the guidelines here, obviously.  But it struck me that

7     whatever you want to say about him posting that, there's no

8     evidence that he actually tried to use that card or that his

9     entry into the Capitol that day was facilitated by that card

10    or even that, even if he tried, it would have facilitated

11    that; right?  So I don't know.  I don't know if it's a true

12    -- when I think of position of -- an abuse of a position of

13    trust, I think of when someone uses something that they

14    have, a skill or even a card or anything like that that

15    they've acquired because of their employment or that --

16    because of their position of trust and they use that to

17    facilitate the crime.  That's an abuse of position of trust

18    or special skill or whatever -- however you want to put it.

19    I didn't, you know -- I'm not saying that it's good that he

20    posted that.  But it didn't facilitate his crime in any

21    meaningful way here, did it?

22         MS. FURST:  Your Honor, I understand what you're

23    saying, and the position that the Government is taking is

24    that that statement alone shows he understood there were

25    going to be barriers there --

```
1                 THE COURT:  Okay.

2                 MS. FURST:  -- and that if he needed to cross the

3     barriers -- the police barriers, he could do that because he

4     was using his card which he's only given as a federal

5     employee --

6                 THE COURT:  That's fair.

7                 MS. FURST:  -- and that, to me, goes to his intent

8     and his knowledge of what was going to occur when he got

9     there.

10                THE COURT:  Okay.

11                MS. FURST:  And so when I say abuse of trust, it's

12    similar to me trying to use my credentials or my PIV card to

13    get special treatment when I go -- I don't know, you know --

14    get the presidential suite at the Hilton or something like

15    that.

16                THE COURT:  Right.  Right.

17                MS. FURST:  So it --

18                THE COURT:  But --

19                MS. FURST:  -- was something he --

20                THE COURT:  -- if you actually did it, though, but

21    he didn't --

22                MS. FURST:  He didn't --

23                THE COURT:  -- do it.  I mean, so anyway --

24                MS. FURST:  He didn't have to because the building

25    was wide open because rioters had breached the doors and
```

1    everybody was pouring in.

2              THE COURT:  All right.

3              MS. FURST:  But that indicates to me that he

4    anticipated barriers --

5              THE COURT:  Fair enough.

6              MS. FURST:  -- and then he knew a way he could get

7    around those barriers.  And, as you know, the Capitol Police

8    were overwhelmed.  I think in every single case that I have

9    had, the defense will say, Well, the doors were open and

10   nobody was stopping me.  Well, nobody was stopping the

11   rioters because they were a mob.  They were all -- there

12   were hundreds of them that were pouring into that building

13   and the police were overwhelmed.  You've heard the

14   congressional testimony, people and officers on media

15   talking about their fears and what was going on.  So the

16   fact that the doors were wide open -- broken open by

17   trespassers and the cops did nothing to stop them doesn't

18   mean it wasn't illegal to go in there.

19              The defendant admitted that once he was inside, he

20   saw rioters damaging property, and he himself, Your Honor,

21   was in the Statuary Hall connector right at 2:35, 2:36, when

22   the huge crowd that was in that small area broke through the

23   police line, and in the video that defense had submitted,

24   you can see all those police in the very beginning and

25   they're all running towards the House side.  They're running

1    towards the House side because Mr. Strong and everybody else

2    behind him were pouring into the building, trying to get to

3    the House and trying to get to the Senate, trying to get to

4    the Speaker's area, trying to stop the certification.

5            In the defense memo, they talked about an officer

6    -- plainclothes officer which you can see both in the open

7    media exhibit that I submitted as well as in the CCTV, and

8    defense is saying he seems to be waving them in.  If you

9    look, Your Honor, he's not waving them in.  He's doing this,

10    (indicating.)  He's pointing at them as if to say, Go

11    around.  Turn back.  These people were not welcomed into the

12    building.

13            Defendant and his companion not only went into

14    that Statuary Hall connector, broke into the House, but

15    before they did that, they had gone down the hallway to the

16    Speaker's suite of offices.  Now, that -- when you see the

17    still pictures, it's just the two of them in there, and

18    moments later is when you see -- in the open-source video,

19    you see the staffers running across the hall, going into the

20    conference room, barricading the door.  Defendant and his

21    companion were there just moments before that happened, and

22    that's when everything was blowing up.  That's a private

23    space, Your Honor.  Public is not -- according to the

24    Capitol Police, the public is not welcome in that space just

25    in a normal situation.

1          THE COURT:  Right.

2          MS. FURST:  So he was in that area, as well.

3          THE COURT:  Yeah, that strikes me -- I will say,

4    that strikes me as definitely one notable feature, you know?

5    I don't -- I know the Government has come in here and

6    argued, you know, a particular defendant saw this and saw

7    that.  I mean, what the defendant saw, you know, I -- does

8    it mean they knew they shouldn't have been in there?  Sure.

9    But he's already pled guilty, you know, to that -- to being

10   in there where he shouldn't have been, and so I don't know

11   how much those things differentiate him, but I do think one

12   thing that is fair game and that I weigh is how deeply he

13   penetrated into the building, like you were saying, being in

14   a place very close to the Speaker of the House and being in

15   a place where, even on a typical day when there is limited

16   public access --

17          MS. FURST:  Yes.

18          THE COURT:  -- to the Capitol, that that -- the

19   public is -- would not be welcomed.  Those are things that I

20   do think weigh against him.

21          MS. FURST:  And I agree with that, Your Honor.

22   And if you listen to the video where he's -- he and his

23   companion are there and the crowd has broken through the

24   House and there -- the crowd's going, you know, Stop the

25   steal; this is our house, I mean, they're trying to get to

1    the Speaker; they're trying to get to the members of

2    Congress.  That's what they were there to do.  And I think

3    that is extremely important in terms of allegations that, We

4    were just walking around and we didn't hurt or do anything.

5    Mr. Strong is also chanting.  I mean, he's there for a

6    purpose, and he did penetrate quite far within the building.

7              I would submit it's very similar to the gentleman

8    -- I think it was Andrew Ericson that I talked about in my

9    brief on Page 25.  He's the gentleman that went in.  He was

10   in about 15 minutes.  He goes into the Speaker's conference

11   room and puts his feet up on the table; pops a beer; and is,

12   you know, posting about it.  So that's specifically a

13   sensitive place that is not open to the public.  And then

14   the -- when we talk about Mr. Perretta, he entered close in

15   time.  I'm just trying to illustrate some of the other

16   cases --

17              THE COURT:  Yeah.

18              MS. FURST:  -- and what they --

19              THE COURT:  No --

20              MS. FURST:  -- got.

21              THE COURT:  -- I think that's right.  I mean --

22              MS. FURST:  And not everybody got incarceration,

23   Your Honor, in the ones --

24              THE COURT:  Right.

25              MS. FURST:  -- that I mentioned, but we

```
 1    recommended -- the Government --
 2                THE COURT:  Right.
 3                MS. FURST:  -- recommended incarceration, and
 4    these are some of the reasons why we did.
 5                THE COURT:  The Ericson case, I think, was -- what
 6    was notable -- what -- one thing that that defendant was,
 7    sort of, a -- something I'm -- I think the judge weighed
 8    against the defendant in that case that's not present here
 9    is, as you point out, the very public social -- the
10    post-event social media activities of the defendant.  Let's
11    put it that way.
12                MS. FURST:  Yeah, they're bragging.
13                THE COURT:  Yeah.  Right.
14                MS. FURST:  Exactly.
15                THE COURT:  In any event --
16                MS. FURST:  And I will admit that Mr. Strong
17    didn't go back and do that.
18                THE COURT:  Right.
19                MS. FURST:  So that is a difference there.
20                THE COURT:  On the margins.
21                MS. FURST:  Right.  Exactly.  And then I noticed
22    Mr. Register -- I think, the last individual for January 6th
23    that you sentenced -- now, he had more egregious activity
24    than Mr. Strong --
25                THE COURT:  Yes.
```

1       MS. FURST:  -- but he was in the building about 30

2   minutes, he was part of the first wave, and he was also near

3   the Speaker's Lobby.  And so I would like to point out, I

4   think we recommended 5 months and Your Honor gave 75 days'

5   incarceration.

6       THE COURT:  Correct.

7       MS. FURST:  So Your Honor, for all those reasons,

8   we are asking you to follow our recommendation and impose a

9   term of 14 days of incarceration followed by 3 years of

10  probation, a $500 restitution which defendant has agreed to

11  in the plea agreement --

12      THE COURT:  Right.

13      MS. FURST:  -- the $10 special assessment, and 60

14  hours of community service.

15      THE COURT:  Ms. Furst, can I ask you one more

16  question --

17      MS. FURST:  Yes.

18      THE COURT:  -- before you sit down.  The -- and

19  I'm going to -- it's really a question that I should ask the

20  Probation folks, and I will ask it.  But is the Government

21  -- I think -- well, in the Probation recommendation, I think

22  they might be also recommending a fine, but I also think it

23  might have been confusion about the restitution and the

24  fine.  It's not clear to me that their -- in other words, I

25  think it's possible because in their -- also in their

1    recommendation, they don't include the restitution.  So I

2    think it might be just confusion about that.  But is the

3    Government recommending a fine on top of all of that?

4              MS. FURST:  No, Your Honor, and I --

5              THE COURT:  Okay.

6              MS. FURST:  -- thought they did recommend a $500

7    fine and a $500 restitution.

8              THE COURT:  Maybe that's right.  Again, this is --

9              MS. FURST:  Yes.

10             THE COURT:  -- for them to --

11             MS. FURST:  Yes, but we are --

12             THE COURT:  -- work through, but in the -- at

13   least in the, you know -- the piece of paper they give me

14   as, sort of -- as far as the sentencing -- the potential

15   sentencing format goes, I don't believe it mentions the

16   restitution.  So in my mind, it was -- I was wondering

17   whether that was just confusion -- well, I guess -- yeah.

18   No, it does mention restitution.  So maybe, that is their

19   recommendation.

20             MS. FURST:  Yeah.

21             THE COURT:  All right.  Anyway, I'll take that up

22   with them.

23             MS. FURST:  Yes.  And we're not asking for a fine,

24   Your Honor.

25             THE COURT:  Okay.

1                  MS. FURST:  Honestly, I knew his financial

2      situation.  He had start- -- there were divorce proceedings

3      before any of this happened.  He's got the two children.

4      He's not working.  He hasn't worked for a year.  They had to

5      sell their house.  Although on paper, it looks like he could

6      afford a fine, I was just trying to be fair.

7                  THE COURT:  Fair enough.

8                  MS. FURST:  Thank you.

9                  THE COURT:  All right.  Thank you.

10                 Ms. Akpan, I will hear from you.

11                 (Brief pause.)

12                 MS. AKPAN:  Thank you, Your Honor.

13                 THE COURT:  And, Ms. Akpan, before you begin, did

14     we schedule today's hearing at 9:00 because you had another

15     matter you had to attend to?

16                 MS. AKPAN:  Yes.  I do have a plea hearing at --

17                 THE COURT:  All right.

18                 MS. AKPAN:  -- 11:00 o'clock.

19                 THE COURT:  Oh, all right.  11:00 o'clock?  We'll

20     be --

21                 MS. AKPAN:  Yes.  Okay.

22                 THE COURT:  -- long done by then.

23                 MS. AKPAN:  Yes.

24                 THE COURT:  Okay.  I -- it occurred to me that

25     that was the case and we were a little bit delayed here and

1    I was wondering if we were going to run into your other

2    obligation, but I don't think we will.

3             MS. AKPAN:  No.  Thank you, Your Honor, for being

4    considerate of my time.

5             I'd like to address point by point.  I don't want

6    to jump all over the place, but I do think it's important to

7    start at the beginning.

8             When Mr. Strong planned to come to the Capitol, I

9    understand the Government's position about the posting, but

10   he did not bring the ID, the PIV card, to the nation's

11   capital.  He wasn't on the government's time.  He was on his

12   own vacation time.  I understand that that could be

13   alarming, but he wasn't supposed to be at work and he wasn't

14   using the card to get in.  He didn't -- actually didn't even

15   bring the card with him to the Capitol.

16            THE COURT:  I don't think it would have worked

17   either.

18            MS. AKPAN:  I don't think so either.  And it does

19   cause a question.  To the extent that the Government is

20   discussing intent, I think one question might be, well,

21   let's say he didn't go inside.  Then would there still be a

22   crime here -- an attempted misdemeanor crime?  And I think

23   we have to draw the line somewhere on that.

24            With all due respect to Ms. Furst, I do dispute

25   some of the things that she stated.  One, regarding the

1    chanting, the reason why we've provided the video and I

2    tried my best to cut and paste different clips is so the

3    Court is fully aware of Mr. Strong's conduct.  He was in the

4    Capitol for 1,620 seconds.  Out of those seconds, 2 --

5    maybe, 2 seconds, you can see him on video actually mouthing

6    something that reflects a chant.  So we're not even talking

7    about 1 percent of the time that he was there that he

8    chanted.  We're talking about 0.1 percent of the time that

9    he chanted.  That means 99 percent -- 99.9 percent of the

10   time, he was doing something else.  And what was he doing,

11   Your Honor?  He was looking around, observing.  Did he take

12   pictures?  Yes.  Your Honor, I don't believe that any of the

13   pictures even show him taking a selfie as, I think, Mr. Pham

14   did who was the retired police officer who you did give a --

15   what I would say, a stiff sentence to.

16              THE COURT:  At the time, he was not retired --

17              MS. AKPAN:  Yeah.

18              THE COURT:  -- to be clear.

19              MS. AKPAN:  And so when we're talking about

20   sentencing disparities, I think it's important -- overall,

21   Your Honor, I think that the Government's chart that they

22   have been providing in these cases is quite telling in some

23   respects because in the first section of the chart, they're

24   basically saying, Look, you pled guilty.  We're offering

25   probation, but everybody else, if you didn't follow our

1    timeline, we're going to ask for jail time.  I don't think

2    that's justice, Your Honor.  There are factors that need to

3    be considered.  While I do understand -- I'm a public

4    defender.  I've, you know -- we understand the benefit of

5    pleading guilty early in the case.  At the same time,

6    considering the volume of discovery that came in in these

7    cases; at the same time, the -- considering the fact that

8    various public defender offices are receiving a lot of these

9    cases, it's a little bit troubling to me that had we pled

10   guilty months ago, the Government's recommendation would

11   have been probation which, kind of, flies in the face of the

12   factors that they suggest that the Court consider.

13          So going back to Mr. Strong's conduct, I think

14   it's quite clear that he's turning around and looking and

15   there's, like, a flow of people coming in.  Mr. Strong is a

16   fairly tall individual.  Perhaps he could have pushed

17   against all of the people who were flooding in, but I think

18   common sense at that moment would tell you just keep going

19   forward and try to get out.  And when he left the scene

20   of -- the one clip of the video that I was trying to lay out

21   for the Court is when he left down, I think, an exit area

22   into the area that Ms. Furst is saying, Well, he walked past

23   the Speaker's hallway and all that.  There were a lot of

24   individuals trying to figure out how to get out of there.  I

25   would even say that when I went on the tour, the Capitol is

1    quite vast, quite unlike what I recall when I was a young

2    kid who went into the Capitol. It's not easy to figure out

3    which way to go, especially with hundreds of people inside.

4    And as he continued to stand there, more and more and more

5    people are flooding in. And, like I said, in that time

6    frame, there's two seconds, maybe, of a chant.

7             Regarding his entry, you know, as the Court has

8    already identified, there was broken glass. The -- no one

9    is disputing the fact that there was broken glass.

10   Mr. Strong is not saying -- he pled guilty to the fact -- to

11   the charge, Your Honor. He's not saying that he didn't see

12   it and didn't have permission to be in there. There was a

13   violent and angry mob. I'm not going to dispute that

14   either. I think that the video shows that, as well. But

15   what was Mr. Strong doing? Was he being violent and angry?

16   No. Even in the area -- the -- what I'll call the

17   Government's Exhibit-B, what I'm just going to shorthand

18   refer to the Jayden X video, it is clear that there are

19   people who are flooding into a very sensitive area of the

20   Capitol. Nowhere in that video do you hear Mr. Strong even

21   utter a word. Prior to that, I did provide Your Honor a

22   screenshot -- I'm sure it would be helpful if I told you

23   which page I provided the screenshot -- on Page 19 of my

24   sentencing memo where Mr. Strong walks over, and it appears

25   he walks over to see what is going on. The camera -- the

1    person videotaping was close enough to hear Mr. Strong's

2    voice.  Just to refresh your memory, Your Honor, Mr. Strong

3    has a fairly deep voice if Your Honor recalls from prior

4    hearings.

5              THE COURT:  I --

6              MS. AKPAN:  And so --

7              THE COURT:  From today, as well.

8              MS. AKPAN:  Right.  And so there -- you hear other

9    individuals' voices, but you don't hear Mr. Strong's voice.

10   He's standing over, as tall as he is, to see what exactly is

11   going on, but prior to that, he's standing with two other

12   officers.  He's not punching them.  He's not violent with

13   them.  He's talking with them, and I understand that he's

14   finding out from them how they're doing.

15             Speaking of officers, let's go back to the

16   plainclothed officer.  Ms. Furst is saying that the

17   plainclothes -- that plainclothed officer, who I'll refer to

18   as an officer wearing a suit, is waving people to not come

19   in.  I dispute that, Your Honor, because there was some kind

20   of hand gesture that that officer was making with his left

21   hand.  And I will -- let me just tell you which page of my

22   sentencing memo I mention that on.  Yes, I think Page 9 of

23   my sentencing memo which would be in the video clip around

24   minute 2:22 and 57 seconds.  Officers came.  A plainclothed

25   officer did some kind of -- communicated some kind of

1  gesture.  I wish I could tell you that I had the Rotunda

2  video to actually show you what that officer did, but I

3  don't.  At least it wasn't in the discovery as I went back

4  through it again.  But I submit to you that there was some

5  signal to the other officers, You can leave, and that's why

6  the group of officers right there in the front turn around

7  and walk away.

8          But in any event, at some point, that plainclothed

9  officer, even from the Government's own video clip -- or let

10 me say, still shot, shows that that officer is close enough

11 to Mr. Strong he could have told him -- could have waved,

12 No, don't come in.  Turn back around.  Go.  He didn't do

13 that.  Mr. Strong walks past that officer, and then there's

14 another officer who walks past Mr. Strong.  Now, I'll be --

15 I would bet that the officers at that time didn't anticipate

16 hundreds of more people coming in, but at some point, if

17 you're there and you see other officers and they're not

18 telling you, Get out of here.  Go away, or, you know,

19 arresting you at that time, you might think, Okay.  I will

20 continue walking or I will -- at this point, it's fine to be

21 where I am.  I'm not saying legally.  I'm just saying --

22          THE COURT:  Right.

23          MS. AKPAN:  -- you know, practically speaking.

24          I understand the Government's point that this is a

25 very serious offense in what took place and we acknowledge

1   that in our sentencing memo, but the point, Your Honor, is

2   that Mr. Strong needs to be judged and sentenced on his

3   conduct.  I understand that Your Honor mentioned that -- how

4   deeply did he penetrate the building?  And I would say --

5   and I understand that that's important to the Court and I

6   think that that is relevant, but I would say that looking at

7   the videos, you can clearly see that there's so many people

8   at this point, you can't turn back.  Mr. Strong could not

9   turn back.  He turned around several times, and where he

10  came in clearly was not the path that he could go back out.

11  And at some point now, with hundreds of people who have

12  surrounded us -- dare I say, if hundreds of people

13  surrounded us in this courtroom right now, I'd be looking at

14  the exits that way, (indicating.)  That's probably not the

15  place that I should be able to go.

16          So with that said, Your Honor, I think the fair

17  sentence here would be probation.  I would rely on our

18  exhibit that I submitted where our office is disputing the

19  split sentence issue.

20          THE COURT:  Yes.

21          MS. AKPAN:  And for purposes -- I do want to

22  highlight and I forgot to mention, Mr. Strong's father is

23  also present in the courtroom, his -- one of his strongest

24  supporters who speaks highly of his character.  I can't

25  imagine what it would be like to be arrested and

1    incarcerated for five days, but that's what Mr. Strong went

2    through.  I couldn't imagine being separated from my

3    children and being in the middle of a divorce and then, all

4    of a sudden, a bad decision that I made is now questioning

5    everything that I represented, and why I think -- that's why

6    I think that the character letters are quite helpful, Your

7    Honor, that speak to Mr. Strong's character.

8           I recognize that the sentencing guidelines don't

9    apply, but to the extent that they could even have applied,

10   I'd highlight the fact that Mr. Strong was also -- not only

11   incarcerated for five days, but also was on the ankle

12   monitor for quite some time.  He's at a point where he needs

13   to be able to move forward.  The punishment for him for the

14   last 14 months has been quite severe.  Even flying here,

15   I've been -- I understand from him, you know -- he was an

16   FAA employee, and now he's on the flight list and will

17   continue to face additional scrutiny, and he has a family to

18   provide for, and I appreciate the fact that the Government's

19   not asking for an additional $500 from him.

20          If there's anything else Your Honor wants me to

21   address, I'm happy to do so.

22          THE COURT:  No, nothing specifically.

23          MS. AKPAN:  Thank you, Your Honor.

24          THE COURT:  All right.  Thank you, Ms. Akpan.

25          Before I hear from Mr. Strong, Ms. Baker, can I

```
 1    just -- could I just have you clarify for me just so I --
 2    I'm getting it right.  So you all do account for -- in your
 3    recommendation, you do account for the restitution, but you
 4    are also recommending an additional -- a $500 fine; is that
 5    correct?
 6              THE PROBATION OFFICER:  Yes, Your Honor.  And we
 7    noted in our justification --
 8              THE COURT:  And you --
 9              THE PROBATION OFFICER:  -- that --
10              THE COURT:  If you're comfortable, you can remove
11    your mask.
12              THE PROBATION OFFICER:  Okay.
13              THE COURT:  You don't -- I don't want to make you,
14    but if you're comfortable, we're comfortable.
15              THE PROBATION OFFICER:  Okay.
16              THE COURT:  Okay.
17              THE PROBATION OFFICER:  Can you hear me good?
18              THE COURT:  Yes.  And you're -- are you
19    vaccinated?
20              THE PROBATION OFFICER:  Yes.
21              THE COURT:  Okay.
22              THE PROBATION OFFICER:  Yes, yes.
23              THE COURT:  Very well.
24              THE PROBATION OFFICER:  So for Mr. Strong, we
25    noted that he does have several assets, but we also wanted
```

```
 1    to highlight to the Court that most of those assets are tied

 2    into his 401(k) vehicles as well as a trust account, and he

 3    does have a significant amount of debt.  So while on paper,

 4    it does look like a fine can be imposed, we wanted to

 5    highlight to the Court those other factors that should be

 6    taken into consideration which is why we also note that the

 7    fine, if imposed, it should be modest, but also if the Court

 8    is not considering a fine, then at least community service.

 9    So --

10             THE COURT:  All right.  All right.

11             THE PROBATION OFFICER:  -- short end of it, we

12    could go either way, Your Honor.

13             THE COURT:  Understood.  Understood.  And just

14    so -- oh, all right.  Very well.  Very well.

15             THE PROBATION OFFICER:  Any other questions?

16             THE COURT:  Nothing further.  I just wanted to

17    confirm -- to make sure I got that.

18             And either Ms. Furst or Ms. Akpan, you can address

19    this.  I just, again, wanted to make sure -- what is the

20    agreement on when the restitution is payable or is there an

21    agreement?  I know, again, when -- just looking at how it's

22    been done in other -- well, let me ask that question.

23             MS. FURST:  Your Honor, I don't specifically

24    recall from the plea agreement, but -- I'm sorry --

25    generally, it's due and payable upon sentencing.  And I
```

```
 1    just, I guess, presumed, since he was flying out here from
 2    California, that he would come prepared, but Ms. Akpan can
 3    probably --
 4              THE COURT:  All right.
 5              MS. FURST:  -- answer that.
 6              THE COURT:  Yeah, I think that is the default,
 7    unless the parties have agreed on something separate; that
 8    it would be immediately -- I think the usual language I use
 9    is it's immediately, you know -- immediately due and
10    payable.
11              Ms. Akpan, you don't have any -- that's not
12    inconsistent with how you expected to proceed here?
13              MS. AKPAN:  No, Your Honor.
14              THE COURT:  All right.  Very well.
15              All right.  Mr. Strong, you have the right to make
16    a statement or present any information to me that you want
17    me to know about as I consider your sentence.  So if you
18    would like to address me, please.  There should be a
19    microphone there.
20              (Brief pause.)
21              THE DEPUTY CLERK:  Up top, Ms. Akpan.
22              MS. AKPAN:  Thank you.
23              THE DEPUTY CLERK:  You're welcome.
24              THE DEFENDANT:  All right.  Can you hear me okay?
25              THE COURT:  Yes, we can hear you.
```

```
 1                THE DEFENDANT:  All right.

 2                Yeah.  All I can really say is I feel really

 3     remorseful because of what had happened and aspired [sic] in

 4     our country and, you know, when I went there, I never, you

 5     know -- I didn't even want to be in the building and I

 6     didn't know any way how to get out or not.  So I just -- I

 7     feel devastated.  I think about it every day.  And I'm just,

 8     you know -- the detrimental [sic] that's been placed on my

 9     family and it's been tough and I'm just sorry.

10                THE COURT:  All right.  You can -- and, Mr. --

11     actually, I should have asked you -- and this is my fault,

12     Mr. Strong.  I should have asked you to remove your mask.

13     The whole point of why we put the podium back there was

14     because I wanted to be able to see your face when you're

15     talking to me and to do that in a safe way.  So if you would

16     just remove your mask and if you want to just repeat what

17     you said.  I think it's important that I see you --

18                THE DEFENDANT:  Oh, okay.

19                THE COURT:  -- when I hear from you.  And I -- it

20     was my mistake not to just --

21                THE DEFENDANT:  Sorry about that.

22                THE COURT:  No, no, no, you had no way of knowing.

23     It was my mistake.  Anyway, go -- if you want to just repeat

24     some of what you said, I'd appreciate it.

25                THE DEFENDANT:  You know, for what it's worth, you
```

1    know, I never wanted to go in the building that day in the

2    first place and, you know, I'd never been there before and

3    I've only seen it on TV and, you know, I was in a large

4    crowd and I could not get out of the crowd and there was

5    lots of people behind me, lots of people to the sides and --

6    of me and in front of me, and I just had to follow where

7    they were going, the flow, you know?  And when I got up to

8    the balcony area, I didn't know where to go from that point

9    either.  So you know -- but I did go in the building and I

10   did take pictures of, you know, people doing things and that

11   I didn't agree with and I wasn't there, you know, very long,

12   but I just, you know -- it's a tough thing, and I'm very

13   remorseful and very saddened by what happened that day and

14   what has continued for me, you know, the troubles that I've

15   been having, you know, with my family and stuff and, yeah, I

16   just -- I'm sorry for, you know, whatever I might have done.

17          THE COURT:  Mr. Strong, other than -- are there

18   reasons why you're remorseful other than just the impact

19   this has had on your family --

20          THE DEFENDANT:  Well --

21          THE COURT:  -- you and your family?  I mean --

22          THE DEFENDANT:  -- other --

23          THE COURT:  -- obviously, it's had --

24          THE DEFENDANT:  -- other than --

25          THE COURT:  -- an impact on you.

```
 1            THE DEFENDANT:  Yeah.  Other than, you know, my
 2    family and me, I mean, you know, there was people that died
 3    that day and that was the first rally I ever went to in my
 4    life and first time I did anything like that.  So -- and
 5    will be the last time, because I ain't ever doing that
 6    again.
 7            THE COURT:  All right.
 8            THE DEFENDANT:  So --
 9            THE COURT:  Very well.  Thank you.
10            (Brief pause.)
11            All right.  Anything further from you, Ms. Furst?
12            MS. FURST:  No, Your Honor.
13            THE COURT:  All right.  Anything further from you,
14    Ms. Akpan?
15            MS. AKPAN:  No, thank you, Your Honor.
16            THE COURT:  All right.  So I have assessed the
17    facts of this case in light of the relevant 3553(a) factors,
18    including the -- well, in this case, not including the
19    sentencing guidelines, but the relevant 3553(a) factors.
20    And so, Mr. Strong, I want to provide some of my thoughts
21    for the record and for you about my thoughts on some of the
22    important things I have to consider, and especially your
23    history and characteristics and the nature of the offense.
24            So let me start with the nature of the offense.
25    This is, in some ways, the hardest thing that my colleagues
```

1    and I have to grapple with in these January 6th cases

2    because what happened that day was, in some sense, as

3    serious an offense as there can be because it threatened the

4    peaceful transfer of power from one president to the next.

5    The damage that was done that day was both tangible and

6    intangible.  And your role was not the most serious of those

7    who were there that day.  That's for sure.  We'll get to

8    that.  But I do have to consider both what you did and the

9    overall events of January 6th.  So let me say a few things

10   about those insofar as I have to consider the nature and

11   circumstances of the offense.

12            Mr. Strong, our Constitution and our laws give you

13   rights that people in other countries would do just about

14   anything for and that many Americans who came before us gave

15   their lives for.  You have the right to vote for whoever you

16   want to for president; you have the First Amendment right to

17   speak out in favor of your candidate; to put up signs; to

18   try to convince your friends and neighbors to vote for that

19   person.  If you don't like how an election is being

20   conducted, you can speak out about that, too; you can call;

21   you can write; you can try to meet with your elected

22   officials in your state or in the Federal Government; you

23   can try to get election laws changed; you can engage in

24   peaceful protest.  You said before, you know, you won't go

25   to any more protests.  I hope, you know -- the First

1    Amendment's a good thing, and there's no reason why you

2    shouldn't be able to lawfully exercise your First Amendment

3    rights in the future.  You can do all those different

4    things.  And finally, even if -- if you've been wronged and

5    you think you have a case, you can file a lawsuit.  You can

6    file a lawsuit in state court; you can file a lawsuit in

7    federal court.

8         At this very moment as I'm speaking to you, people

9    in Ukraine are losing their lives for these rights, but

10   freedom means that with those rights come responsibilities,

11   and so what you can't do under any circumstances is become

12   part of a mob that uses violence and the threat of violence

13   to disrupt Congress's ability to fulfill its role to process

14   the certification of the Electoral College vote for

15   president, but that's what you did and there's nothing

16   patriotic about it.  So what happened that day not only

17   damaged property and injured people, and I think you're well

18   aware of all that, but I want to emphasize, it was really a

19   real blow against the customs and practices that help

20   support the rule of law and help support our Constitution.

21   It snapped what was our previously unbroken tradition of the

22   peaceful transfer of power.  We can't get that back.  So it

23   was more than extremely serious; it was a national disgrace,

24   and you played a role in that.

25        So let's turn to your role.  In many ways, it was

1     limited.  I won't go through all the -- let me just tick

2     through.  I mean, you weren't part of any organization or

3     planning; you didn't -- you weren't a leader; you weren't a

4     part of any groups that took part in that day; you didn't

5     engage in any violence or you didn't damage any property;

6     you didn't have any weapons; you didn't -- there were no

7     public displays of celebration on your part, none of those

8     things, and all of that is to your -- in your favor.

9          I would say the one thing to me that does weigh

10    somewhat against you is you did get pretty far into that

11    building and you did -- you were really adjacent to that

12    Speaker's suite of offices and that -- I do have to weigh

13    that, but I would say, to me, that's the principal

14    aggravating factor, if you will, that weighs against you.

15    You did delete a photo, but, you know, you spoke to the FBI

16    voluntarily.  You gave them other photos that you'd taken.

17    So to me, that was -- your deletion of one photo was hardly

18    an attempt to conceal evidence, and the Government's not

19    really arguing that that was what happened there anyway.

20         The other thing I have to consider is your

21    characteristics as an offender.  And, again, these things --

22    almost all of these things weigh in your favor.  I read all

23    the letters and character references from your family; from

24    your coworkers; from your pastor.  Those are all very

25    positive things.  You don't have any criminal history.

1    That's a positive thing.  You did take responsibility,

2    although it is a year after -- well over a year after what

3    happened on January 6th.  I give you, Mr. Strong, full

4    credit for that.  I think it's going to be interesting to

5    see, as we go forward, when defendants come in here and say

6    they want credit if they're pleading guilty, you know, a

7    year-and-a-half, two years after the offense, what judges

8    will do.  There's probably issues in the sense that the

9    defense wants to look at voluminous -- the evidence --

10   voluminous discovery that's been produced.  By the same

11   token, I think the Government may, you know, be reluctant to

12   sign off on pleas when they're not 100 percent sure of the

13   full extent of what a particular defendant has done, in

14   which case, I'm not going to weigh that against the

15   defendant, but in any event, I give you credit for that.

16          You are a federal employee with the FAA.  The

17   Government has argued that this was a -- your conduct that

18   day was an abuse of a position of trust.  I don't really see

19   it that way.  I do think it's startling to think how someone

20   with the kind of job you had, a job that involved an

21   important role in making sure that planes flew -- fly

22   safely, that someone could have had the judgment you had to

23   come here and participate in what happened, but I don't

24   think it's an abuse of trust as I've expressed, and you've

25   shown remorse here today, and I accept that remorse.

1      The other factors I have to consider -- the next

2  factor I consider is the sentence has to reflect the

3  seriousness of the offense, promote respect for the rule of

4  law, and provide just punishment.  It should afford adequate

5  deterrence to criminal conduct, protect the public from

6  future crimes of yours, and promote rehabilitation.  Of all

7  those things, I think the most important is general

8  deterrence.  We have to make sure that that event on January

9  6th is not repeated because of the damage it does.  In

10  particular, the damage to our country.

11      And then I have to consider the types of sentences

12  available.  We've talked about those.  The Probation Office

13  and Mr. Strong have asked for probation.  The Government has

14  asked for 14 days of incarceration and 3 years' probation.

15      I also have to consider unwanted sentence

16  disparities.  Usually, those are taken care of by the

17  guidelines, but I have taken into account the cases each

18  side has raised with me as far as comparators -- your

19  comparators go, other defendants who have been sentenced in

20  particular ways.

21      And I have to consider the need to provide

22  restitution which is something the parties have agreed on.

23      So after considering all those 3553(a) factors and

24  considering what is sufficient but not greater than

25  necessary to comply with the purposes of sentencing, I am

1    going to sentence Mr. Strong to 24 months of probation, to

2    include 30 days of home detention.  So 30 days, you will be

3    restricted to your resident -- residence, consistent with

4    the provisions of home detention, Mr. Strong, and, of

5    course, the $500 in restitution.

6         So I will now impose that sentence.  Mr. Strong,

7    if you would stand, I will now impose the sentence which I

8    conclude, after considering all the 3553(a) factors, is

9    sufficient but not greater than necessary to comply with the

10    purposes of sentencing.

11         So pursuant to the Sentencing Reform Act of 1984

12    and in consideration of the provisions of 18 United States

13    Code 3553, it is the judgment of the Court that you, Kevin

14    Strong, are hereby sentenced to a term of 24 months --

15    that's 2 years -- of probation on Count 4.  In addition, you

16    are ordered to pay a special assessment of $10 in accordance

17    with 18 United States Code 3013.  And I do find that you do

18    not have the ability to pay a fine and, therefore, I waive

19    imposition of a fine in this case.

20         While on supervision, you must abide by the

21    following mandatory conditions as well as the standard

22    conditions of supervision which are imposed to establish the

23    basic expectations for your conduct while on supervision.

24         The mandatory conditions include, one, you must

25    not commit another federal, state, or local crime.

1          Two, you must not unlawfully possess a controlled

2    substance.

3          Three, you must refrain from any unlawful use of a

4    controlled substance.  You must submit to one drug test

5    within 15 days of placement on supervision and at least two

6    periodic drug tests thereafter as determined by the Court.

7          And you must make restitution in accordance with

8    18 United States Code Sections 3663 and 3663A or any other

9    statute authorizing a sentence of restitution.

10          You shall also follow -- I will authorize

11    supervision and jurisdiction of this case to be transferred

12    to the United States District Court for the Central District

13    of California.

14          And you shall also comply with the following

15    special conditions:

16          First, you are ordered to make restitution to the

17    Architect of the Capitol in the amount of $500.  I determine

18    that you do not have the ability to pay interest and,

19    therefore, I waive any interest or penalties that may accrue

20    on the balance of that, but that is -- well, we'll talk

21    about how that's payable in a moment.

22          Financial information disclosure.  You must

23    provide the probation officer access to any requested

24    financial information and authorize the release of any

25    financial information.  The Probation Office may share

1    financial information with the United States Attorney's

2    Office.

3            Let's see.  I've already mentioned that.

4            As I mentioned also, the other -- another

5    condition of your supervision will be location monitoring or

6    home detention.  You shall serve 30 days in home detention

7    in the location monitoring program and you shall be

8    monitored by radio frequency, or RF, monitoring or GPS

9    monitoring and shall abide by all technology requirements.

10   For the period of home detention, you shall remain at your

11   place of residence except for employment, education,

12   religious services, medical or substance abuse or mental

13   health treatment, attorney visits, court appearances, court

14   obligations, or other activities approved in advance by the

15   Probation Office.  The costs of participation in the

16   location monitoring program -- actually, in this case --

17           What's the Government's view on whether the

18   defendant can pay for the location monitoring program

19   himself in this case, Ms. Furst?

20           MS. FURST:  Your Honor, I don't know the costs

21   specifically, but I do know that his father has been

22   supporting him, and although, maybe, he can't pay the costs,

23   I think the costs are minimal enough that he can handle

24   them.

25           THE COURT:  Ms. Furst, what's your view on this --

1    I mean, Ms. Akpan.   Sorry.

2             MS. AKPAN:   Your Honor, I don't know how much of a

3    -- it would cost, but I do think Ms. Furst is correct that

4    Mr. Strong's father is his source of support at this point,

5    and I think it would end up somewhat punishing him.  So we'd

6    ask for him not to have to pay the costs of that.

7             THE COURT:  All right.  Given that this hasn't

8    been teed up, I'm just going to waive the costs of

9    participation in the location monitoring program.  I'm going

10   to waive them.  It's -- especially given it's 30 days.

11   We're talking about a very -- relatively short period of

12   time.

13            And then, third, as far as another condition of

14   supervision, I'm going to ask -- require the defendant to

15   complete 60 hours of community service.  And the probation

16   officer will supervise the probation [sic] in the program by

17   approving the program, and he must provide written

18   verification of the completed hours to the probation

19   officer.

20            Let's see.  Restitutions are -- shall be disbursed

21   to the following victim: the Architect of the Capitol,

22   Office of the Chief Financial Officer, Attention: Kathy

23   Sherrill, CPA, Ford House Office Building, Room H2-205B,

24   Washington, D.C. 20515.  Again, the restitution payment is

25   $500.

1              The financial obligation -- that financial

2    obligation is immediately payable to the Clerk of the Court

3    for the U.S. District, 333 Restitution [sic] Avenue, NW,

4    Washington, D.C. 20001.  And within any -- 30 days of any

5    change of address, you shall notify the Clerk of the Court

6    of the change until such time as the financial obligations

7    are paid in full.

8              The Probation Office shall release the presentence

9    investigation report to all appropriate agencies which

10   includes the United States Probation Office in the approved

11   District of residence in order to exer- -- and execute the

12   sentence of the Court.

13             And, Mr. Strong, under certain circumstances, you

14   have the right to appeal the sentence imposed by this Court.

15   If you choose to appeal, you must file any appeal within 14

16   days after the Court enters judgment.  If you are unable to

17   afford the costs of an appeal, you may request permission

18   from the Court to file an appeal without costs to you.

19             And finally, pursuant to the D.C. Circuit's

20   opinion in United States v. Hunter, 809 F.3d 677, decided on

21   January 12th, 2016, are there any objections to the sentence

22   imposed that are not already noted on the record?

23             Ms. Furst?

24             MS. FURST:  No, Your Honor.

25             THE COURT:  All right.  Ms. Akpan?

```
 1              MS. AKPAN:  No, Your Honor.  Thank you.  I did --
 2              THE COURT:  All right.  Very well.
 3              MS. AKPAN:  I did have one question about the
 4     location -- the 30-day home detention.
 5              THE COURT:  Mm-hmm.
 6              MS. AKPAN:  I guess we'll check with the probation
 7     officer, but he'd have the time to get back to California
 8     to --
 9              THE COURT:  Correct.  I mean, it just has to be 30
10     days within the time -- at some point while he's on
11     probation.  So it wouldn't necessarily start today, but it
12     would be as directed by the Probation Office, and I think
13     given -- given that he'll be in California, it wouldn't make
14     sense for it to start today anyway.
15              MS. AKPAN:  Thank you, Your Honor.
16              THE COURT:  All right.  Ms. Furst, I think -- are
17     there any motions on the Government's behalf?
18              MS. FURST:  Your Honor, I move to dismiss the
19     remaining counts without prejudice.
20              THE COURT:  All right.  Very well.  That motion
21     will be granted.
22              Are there any -- let me just make sure -- okay.
23     Are there any other things that you think I need to address,
24     Ms. Furst?
25              MS. FURST:  No, Your Honor.  Thank you.
```

1          THE COURT:  All right.  Ms. Akpan?

2          MS. AKPAN:  No, Your Honor.  Thank you.

3          THE COURT:  All right.  Very well.

4          Good luck, Mr. Strong.  As I said, you're going to

5     be -- this is going to be transferred to the Central

6     District of California.  So you'll be supervised out there,

7     you know?  And I hope everyone who participated that day

8     understands both the very tangible reasons, but also the

9     intangible reasons why what happened that day was quite

10    serious.  But good luck to you on probation, sir.

11          If there's nothing further, then, the parties are

12    dismissed.

13          THE DEPUTY CLERK:  All rise.  This Honorable Court

14    is adjourned.

15          (Proceedings concluded at 10:24 a.m.)

16                  * * * * * * * * * * * *

17           <u>**CERTIFICATE OF OFFICIAL COURT REPORTER**</u>

18    **I, TIMOTHY R. MILLER, RPR, CRR, NJ-CCR, do hereby certify**

19    **that the above and foregoing constitutes a true and accurate**

20    **transcript of my stenographic notes and is a full, true and**

21    **complete transcript of the proceedings to the best of my**

22    **ability, dated this 12th day of July 2022.**

23                          <u>**/s/Timothy R. Miller, RPR, CRR, NJ-CCR**</u>
                            **Official Court Reporter**
24                          **United States Courthouse**
                            **Room 6722**
25                          **333 Constitution Avenue, NW**
                            **Washington, DC 20001**